UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 0:14-CV-62567

TRACY SANBORN and LOUIS
LUCREZIA, on behalf of themselves and all
others similarly situated,

                Plaintiffs,

    v.

NISSAN NORTH AMERICA INC.,
NISSAN MOTOR COMPANY, LTD.,

                Defendants.

**PLAINTIFFS' OPPOSITION TO NISSAN'S MOTION TO DISMISS**

      In moving to dismiss this proposed class action under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Nissan characterizes Plaintiffs' case as: "I browsed the internet, I bought a car, I think it has a defect, so [Nissan] fraudulently violated the FDUTPA." (Mot. at 12.) This case is much more serious than one or two people who "think" something is wrong with their car, however. Dashboards are melting in hundreds of Nissan cars all throughout Florida—not only leaving a sticky, smelly mess that cheapens the vehicles' resale value, but casting an intermittent glare on the windshield that has caused at least two reported accidents already. A misshapen melting dashboard also interferes with the safe operation of the passenger-side airbags, which are designed to deploy through precisely-designed perforations in the dashboard. The problem of melting Nissan dashboards is so pervasive in Florida that it has become the subject of ongoing investigative reports by NBC, ABC, and FOX news affiliates. In response, Nissan maintains that nothing is wrong and that it has no knowledge of any systematic defect in the dashboards' plastic material. It will admit to nothing more than "a few isolated consumer complaints." This FDUTPA case is intended to force Nissan to acknowledge that a systemic

1

defect exists, to warn consumers of the safety hazard posed by the defect, and to either fix the problem or otherwise make Nissan owners whole.

Nissan claims that it cannot be held liable under the FDUTPA because it lacked "actual knowledge" of any defect in the dashboard material. Setting aside the fact that the complaint alleges that Nissan knew about the defect as far back as 2006, the FDUTPA is a consumer-oriented statute that was enacted precisely because proving a corporate defendant's state of mind (as required in common law fraud cases) is often problematic. The FDUTPA therefore does not require proof of knowledge to establish a violation of the statute. And even where knowledge has been alleged in auto defect cases, plaintiffs have been permitted to allege knowledge in the most general terms—that the company "knew or should have known." The real issue under the FDUTPA is not whether Nissan knew about the defect and intended to deceive consumers, but whether selling cars with defective dashboards is objectively unfair to consumers or whether a reasonable consumer would feel deceived. The answer to those questions—as evidenced by the hundreds of consumer complaints and extensive local media coverage—is likely yes. But the questions cannot be definitively answered based on pleadings alone, and for that reason Nissan's motion to dismiss this case at the pleading stage should be denied.

It is worth noting, however, that Nissan's protestations of ignorance are not credible. Automakers conduct accelerated aging tests on the plastic materials used in their vehicles—simulating long-term exposure to extreme levels of sunlight, temperature, and humidity—precisely because the wrong plastic formulation can lead to pre-mature degradation and cause serious problems. Nissan therefore would have been well-aware that its dashboard material was not suitable for use in the high-intensity sunlight and humid conditions often encountered in Florida. Nissan also employs a variety of early warning systems and statistical projections to detect problems in its vehicles long before they affect most drivers, and so would have had very early indications that the dashboard's plastic material

was degrading too quickly in Florida and other climates. Yet rather than upgrading the dashboard material, or even alerting consumers to the problem, Nissan continued manufacturing cars with the same defective material and has denied to this day that a defect exists.

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

Plaintiffs Tracy Sanborn and Louis Lucrezia bring this case on behalf of Florida owners of certain Nissan Altima and Infiniti vehicles made with defective dashboard material. (*See* Amended Class Action Complaint ("Compl.") [Doc. 23], ¶¶ 1, 11, 42.) The plastic material was not properly formulated and cured to withstand exposure in the high-intensity sunlight and humid conditions found in Florida. (*Id.*, ¶¶ 1, 23.) After a few years of routine use in a typical Florida climate, the dashboards appear to "melt." The degraded plastic material turns into a sticky mess and emits noxious fumes. (*Id.*, ¶ 12.) The unsightly outcome looks like this:



(*Id.*, ¶ 15.)

As unpleasant as a melted dashboard is to look at and smell, it is also rather dangerous. The sticky substance that the dashboard material degrades into reflects sunlight at odd angles. A melted dash thus casts an unpredictable glare onto the windshield that can obscure the driver's vision of the road and

make it difficult to operate the vehicle safely. (Compl., ¶ 12.) At least two accidents have been reported to the National Highway Traffic Safety Administration (NHTSA), and there are likely several more that have not been reported. (*Id.*, ¶¶ 19-21.) The picture below, taken by a Nissan driver with a melted dashboard, shows how reflections from a melted dashboard can obstruct the driver's view of pedestrians, for example:



(*Id.*, ¶ 15.)

Melted dashboards can also interfere with the safe operation of the passenger-side airbag. (Compl., ¶ 13.) That airbag is designed to deploy through perforations in the dashboard that must meet precise specifications for size and spacing. But as the dashboards degrade, they become visibly misshapen, interfering with the precision sizing and spacing of the perforations, and raising the likelihood that the passenger-side airbag will not release as designed in the event of an accident. (*Id.*)

Melting dashboards have become a serious problem, with hundreds of Nissan owners posting complaints on the NHTSA website and Nissan's Facebook page. (Compl., ¶ 30.) To give just a few examples:

- Sometime in December 2013 I noticed the dashboard of my Nissan Altima 2008 melting causing a shiny substance [that] causes a tremendous glare on the windshield which makes it difficult to see when driving. This should not be happening…obviously defective materials by Nissan. I have researched and on one complaint forum alone

- found 196 pages of the same complaint and the same year and model . . . I filed a complaint directly with Nissan on 2-17-14 I was told that I needed to get a diagnoses from a Nissan dealer so I did … Nissan clearly stated that the dashboard needed to be replaced … well on 2-21-14 a Nissan rep named [xxx] out of Tennessee called me back and said that Nissan will not pay for the replacement of the dashboard.

- My 2009 Nissan Altima Coupe'[s] Dash is melting.  A car dealership told me when the dashboard is melting the airbag on the passenger side will not deploy correctly in a crash.  I also can not see out of the front windshield because the shiny sticky mess throws a blinding glare while driving.  Nissan will not help me.  This is a problem with the product used for the dashboard.

- Beginning in 2012 (less than 4 years after purchasing my car), I started to notice that portions of the dashboard were melting.  In the years since, it has gotten progressively worse. … From what I can tell, many others are experiencing this same problem.  This is not a cosmetic issue, but rather a serious safety concern.  The melting dashboard is shiny and reflect sunlight, causing sudden blinding glares while driving.  I have experienced these sudden flashes of light several times on the highway.  The reality of being unable to see while at speed exceeding 60 miles is incredibly scary and dangerous.

- The dashboard has been melting and getting gooey and sticky for months.  This causes a distracting sparkling reflection on the windshield during certain days when it is very sunny and the sun shines directly at windshield.  The defect was reported to Nissan (dealership in Fort Lauderdale, Florida, and the corporate office) but the company does not want to pay for repairing it because the warranty has expired, despite numerous similar complaints by other owners of the same model and the safety issue.

(*Id.*, ¶¶ 22, 32.)

The melting dashboard problem has become so pervasive in Florida that it has triggered several news reports by local TV stations.[1] Yet despite all the customer complaints and media attention, Nissan has remained unwilling to even acknowledge that there is a systemic problem, categorizing the issue as just "a few isolated consumer complaints." (Compl., ¶ 30.)  Nissan's willful ignorance is nothing new.

---

[1] *See, e.g.,* http://www.abcactionnews.com/money/consumer/taking-action-for-you/hundreds-of-drivers-say-their-dashboard-is-melting-and-car-makers-are-not-issuing-a-recall; http://www.local10.com/news/man-wants-nissan-to-pay-for-cars-melting-dashboard/31178200; http://www.wptv.com/money/consumer/sticky-shiny-safety-issue-drivers-complain-of-sun-glare-from-melting-dashboards; http://www.wflx.com/story/25390499/drivers-say-dashboard.

It received complaints of melting dashboard material in class vehicles back in 2006 (if not earlier), but continued selling vehicles with the same defective material. (*Id.*, ¶¶ 26-28.) Nissan also refuses to pay to replace its defective dashboards, which typically costs its customers around $2,000. (*Id.*, ¶¶ 31-32.) Many drivers cannot afford to pay $2,000 for a new dashboard, and those that can have no assurances that the problem won't recur and require another expensive repair. (*Id.*, ¶¶ 3, 33.) Whether or not drivers pay for repairs, the melting dashboard problem has affected their vehicles' resale value and made it very difficult to sell vehicles manufactured with the defective dashboard material. (*Id.*, ¶ 33.)

Plaintiffs Sanborn and Lucrezia are two of the many Nissan owners who were sold vehicles with defective dashboard materials. (Compl., ¶¶ 34, 38.) Like all Nissan's customers, they were never informed that the dashboard material was not suitable for use in Florida's high-intensity sunlight and humid conditions. (*Id.*) On behalf of themselves and other Florida consumers who purchased Nissan vehicles with defective dashboard material, they are seeking relief under the FDUTPA—which prohibits unfair and deceptive practices in all contexts and has been utilized in the past to provide compensation to car owners who suffer diminished value caused by defective parts. (*Id.*, ¶¶ 51-57.) In the alternative, Plaintiffs also seek relief under the common law of unjust enrichment, which provides for recovery of profits that, in the interest of justice, Nissan should not be permitted to retain. (*Id.*, ¶¶ 58-64.)

## LEGAL ANALYSIS

### A. **Plaintiffs in Product Defect Cases Have Standing to Pursue Claims on Behalf of Others With the Same Alleged Defect.**

Nissan first asks the Court to find that Plaintiffs lack standing to assert claims on behalf of all class members. (Mot. at 7-9.) It argues that Plaintiffs purchased 2008 and 2009 Nissan Altimas, and so should not be permitted to represent owners of 2007 Altimas or owners of 2003-2009 Nissan Infinitis. The extent to which Plaintiffs can represent anyone's interests (aside from their own) has traditionally been resolved at class certification, based on a full factual record, but Nissan claims that "it is black-

6

letter law in the Eleventh Circuit that Plaintiffs lack standing to bring claims related to vehicles that they have not purchased," and so the Court should address the matter at the pleading stage. (Mot. at 2.)

A similar argument has been raised repeatedly in food and supplement mislabeling cases. *See, e.g., Brazil v. Dole Food Co., Inc.,* No. 12-CV-01831-LHK, 2013 WL 5312418, at *7-8 (N.D. Cal. Sept. 23, 2013) (discussing cases). The first Florida case to find merit in the argument involved claims that GNC had mislabeled several supplements as promoting joint health and function. *Toback v. GNC Holding*, No. 13-80526-CIV, 2013 WL 5206103 (S.D. Fla. Sept. 13, 2013). The court acknowledged that the case law was mixed and other cases had found the question more appropriate for resolution at the class certification stage, but concluded that the Eleventh Circuit's holding in *Prado-Steiman v. Bush*—"that at least one named plaintiff must establish Article III standing for each class subclaim"—meant that the named plaintiff could never establish standing with respect to products he did not purchase, and that waiting until class certification would not change that result. *Toback*, 2013 WL 5206103 at *4-5 (citing *Prado-Steiman*, 221 F.3d 1266, 1279-80 (11th Cir. 2000)). Several other food and supplement mislabeling cases have since relied on *Toback* to reach the same result. *See, e.g., Garcia v. Kashi Co.*, No. 12-21678-CIV, 2014 WL 4392163, at *26 (S.D. Fla. Sept. 5, 2014) ("Although the Court finds persuasive arguments supporting both positions, it appears that *Toback* is the only case from the Eleventh Circuit to directly address the issue."); *Reilly v. Amy's Kitchen, Inc.*, No. 13-21525-CIV, 2013 WL 9638985, at *2 (S.D. Fla. Dec. 9, 2013).

Nissan asks the Court to extend the holding of these cases beyond food and supplement mislabeling cases and apply it to this product defect case. But in product defect cases, it is quite common for a single plaintiff to represent others who suffer from the same defect, regardless of the model or model year of the product in question. What matters in these cases is whether the named plaintiff and the proposed class share a common defect, not whether they purchased precisely the same

7

product. The recent front-loading washer cases provide a good example. Multiple courts across different circuits certified consumer classes consisting of a wide range of different models and model years that all shared the same alleged defect. The fact that separate plaintiffs had not been added to the case to represent each of the hundreds of possible model/model year combinations posed no obstacle— to the contrary, adding so many plaintiffs would have overridden much of the efficiency that class certification brings to prevalent cases. *See In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838, 844, 849 (6th Cir. 2013) (two named plaintiffs representing 21 different models over a period of 9 model years) *cert. denied*, 134 S. Ct. 1277 (2014); *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 361 (7th Cir. 2012) (27 different models of Kenmore-branded washers over at least nine model years) *cert. granted, judgment vacated,* 133 S. Ct. 2768 (2013) and *judgment reinstated,* 727 F.3d 796 (7th Cir. 2013) *cert. denied,* 134 S. Ct. 1277 (2014); *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 474 (C.D. Cal. 2012) (four state-wide classes, each with one class representative representing all models and model years of Bosch and Siemens front-loading washers) *leave to appeal denied,* 2013 WL 1395690 (9th Cir. Apr. 1, 2013) *cert. denied,* 134 S. Ct. 1273 (2014).

Consistent with this generally-accepted practice, Florida courts have permitted FDUTPA claims to proceed past the motion to dismiss stage in cases where a named plaintiff did not purchase each of the multiple models or model years containing the alleged defect. *See Sanchez-Knutson v. Ford Motor Co.*, No. 14-61344-CIV, 2014 WL 5139306, at *2 (S.D. Fla. Oct. 7, 2014) (one plaintiff for three model years of Ford Explorers); *Rothstein v. DaimlerChrysler Corp.*, No. 8:05-CV-1126T30-MSS, 2005 WL 3093573, at *1 (M.D. Fla. Nov. 18, 2005) (one plaintiff for all 1999-2004 Jeep Grand Cherokees); *see also Collins v. DaimlerChrysler Corp.*, 894 So. 2d 988, 989, n.2 (Fla. Dist. Ct. App. 2004) (state case with one plaintiff for three different models and three different model years).

In fact, Plaintiffs have not encountered any case—within Florida or outside of Florida—finding at the pleadings stage that a named plaintiff lacked standing to represent other consumers with the same alleged defect. To the extent the Court might be inclined to become the first, and extend *Toback*'s reasoning in mislabeling cases to the product defect setting, Plaintiffs would respectfully submit that *Toback* misinterpreted what the Eleventh Circuit meant when it held that standing must exist for each "subclaim." The "subclaims" that the Eleventh Circuit discussed in *Prado-Steinman* were "ten substantive, class wide claims" that the district court had identified in certifying a class of developmentally-disabled persons who meet Medicaid eligibility requirements for ICF/DD care. *Prado-Steiman*, 221 F.3d at 1270-71. The ten claims arose under some of the same statutes, which is likely why they were sometimes referred to as subclaims in the opinion, but what the Eleventh Circuit was focused on was that the claims challenged distinct conduct and distinct injuries. *See id.* at 1281 ("there are sharp differences amongst class subgroups in the type of conduct challenged and the type of injury suffered"). The named plaintiffs in *Prado-Steiman* had been subject to the conduct and suffered the injuries described in three of the claims, but the record on certification was not sufficient to show that the same was true of the other seven claims. *Id.* at 1280. The Eleventh Circuit accordingly vacated the trial court's certification decision and remanded the case for further consideration. *Id.* at 1282.

The problem of different "subclaims" within the meaning of *Prado-Steinman* is not present here. Everyone in the proposed class was exposed to the same type of conduct and suffered the same injury. Perhaps an argument can be made that different labels on food or supplements cause different injuries, but here the injury was caused by the same allegedly defective plastic material for everyone in the proposed class. There is, in other words, no reason under *Prado-Steinman* that the named plaintiffs cannot pursue claims on behalf of all consumers allegedly injured by the same defect.

## B. Rule 9(b) Does Not Apply to FDUTPA Claims.

Nissan next argues that Plaintiffs' FDUTPA claim should be dismissed because it fails to meet the heightened pleading standards of Rule 9(b). (Mot. at 11-12.) While some courts have found Rule 9(b) applicable to FDUTPA claims, others disagree. They point out that FDUTPA was intended to simplify consumer protection law and reach unfair conduct beyond that proscribed by the common law tort of fraud. Imposing the pleading requirements that Rule 9(b) places on fraud claims would therefore undermine the statute's very purpose. *E.g., U.S. Bank Nat. Ass'n v. Capparelli*, No. 13-80323-CIV, 2014 WL 2807648, at *5 (S.D. Fla. June 20, 2014); *Sanchez-Knutson,* 2014 WL 5139306 at *15; *Toback,* 2013 WL 5206103 at *2.

But it likely makes little difference whether or not Rule 9(b) applies in this case. Plaintiffs have done far more than vaguely allege that Nissan engaged in unfair and deceptive conduct. They describe in detail why the vehicles that Nissan has sold them and other Florida consumers are defective, including several pictures to illustrate how severely the dashboard defect can impair drivers' ability to see the road. (*See* Compl., ¶¶ 11-22.) They also describe the circumstances surrounding Plaintiffs' purchases of the vehicles in detail, confirming that neither Nissan nor its sales representatives warned Plaintiffs that the dashboard could not withstand prolonged exposure to the Florida sun. (*See* Compl., ¶¶ 34, 38.) Nissan complains that Plaintiffs do not specify "which, if any, of [Nissan's] advertising and promotional materials … omitted notice of the allege defect." (Mot. at 11.) But the complaint is clear that Nissan *never* disclosed the dashboard defect—not in the brochures that Plaintiffs read or on the window stickers, not on its website, and not through its sales representatives. (Compl., ¶¶ 34, 38.) In fact, the complaint specifies that—to this day—Nissan denies that anything is wrong with its dashboards. (*Id.*, ¶ 30.)

### C. Plaintiffs Have Alleged a Violation of the FDUTPA

An FDUTPA claim has three elements: (1) an unfair or deceptive practice, (2) causation, and (3) actual damages. *Carriuolo v. Gen. Motors LLC*, No. 14-61429-CIV, 2014 WL 7011022, at *2 (S.D. Fla. Dec. 11, 2014); *see also* Fla. Stat. §§ 501.204(1), 501.211. Nissan raises challenges pertaining to each element, which Plaintiffs address in turn below.

#### 1. Nissan Committed an Unfair or Deceptive Practice By Selling Vehicles With Dashboards Not Suitable For Use in Florida.

##### a. Privity Is Not Required By the FDUTPA.

An unfair practice under the FDUTPA is one that offends public policy and is unethical, unscrupulous, or substantially injurious to consumers, while a deceptive practice is one that is likely to mislead a consumer acting reasonably under the circumstances. *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). Nissan insists that it did not commit either an unfair or a deceptive practice because it never dealt directly with Plaintiffs (or other Nissan consumers) and so could not have deceived them. (Mot. at 14.) But several cases have found that automobile manufacturers—who almost always sell to consumers through dealerships rather than directly—can be held liable under the FDUTPA for placing defective vehicles into the stream of commerce. For example, courts have found that Chrysler could be held liable under the FDUTPA for selling various models with allegedly defective seatbelt buckles; that Ford could be liable for failing to disclose that 2011-2013 Ford Explorers were defective in that exhaust could enter the passenger compartment; and that Chrysler (again) could be liable for selling 1999-2004 Jeep Grand Cherokees with defective rotor/caliper front brake assemblies. *Collins,* 894 So. 2d at 989-990; *Sanchez-Knutson*, 2014 WL 5139306 at *2, 13; *Rothstein*, 2005 WL 3093573 at *1, 2.

None of the preceding auto cases explicitly considered whether privity was required between the defendant manufacturer and the end-consumer—it was assumed, as the FDUTPA includes no such

11

limitation.  In fact, the FDUTPA specifies that unfair and deceptive practices are prohibited "in the conduct of *any* trade or commerce," not just in trade or commerce that interface directly with end-consumers.  Fla. Stat. § 501.204(1); *see also id.*, § 501.203 ("trade or commerce" includes distribution of goods).  And in resolving any ambiguities in the statute, the FDUTPA is supposed to be "construed liberally" to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition."  *Id.*, § 501.202.  Plaintiffs have found only one case where a manufacturer of an allegedly defective product explicitly argued that it could not be held liable under the FDUTPA because it was not in privity with the end-consumer:  *Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, No. 10-23869-CIV, 2012 WL 1570057 (S.D. Fla. May 2, 2012).  The court rejected the argument, pointing out that the defendants could not identify any statutory language that requires privity, and holding that outside of the real estate context (where separate duties apply), the absence of privity does not preclude a consumer's FDUTPA claim.  *Id.* at *9-10.

### b. Knowledge Is Not Required By the FDUTPA

Nissan also contends it cannot be held liable under the FDUTPA because Plaintiffs have not adequately alleged that Nissan knew about the dashboard defect when it manufactured and distributed the vehicles.  (Mot. at 14.)  The defendant in *Gavron v. Weather Shield* made the same argument, but as the court found, the "FDUTPA does not require [a defendant] to have subjective knowledge of alleged defects in order for [plaintiffs] to state a viable FDUTPA claim."  *Gavron v. Weather Shield Mfg., Inc.*, 819 F. Supp. 2d 1297, 1302 (S.D. Fla. 2011).  If consumers are sold a defective product and therefore do not receive the benefit of their bargain, they can recover under the FDUTPA even if they cannot prove that the seller knew about the defect.  That is because the FDUTPA is concerned with fairness to the consumer and whether a reasonable consumer would feel deceived—not on the manufacturer's intent or state of mind.  *Id.* ("[T]he Act focuses on whether an act is deceptive, not whether a defendant knew that the allegedly violative conduct was occurring."); *see also Orkin Exterminating Co. v. F.T.C.,* 849 F.2d

1354, 1368 (11th Cir. 1988) (interpreting FTC Act: "Given that a practice may be deceptive without a showing of intent to deceive, it is apparent that a practice may be found unfair to consumers without a showing that the offending party intended to cause consumer injury"), *and* Fla. Stat. § 501.204(2) (in construing the FDUTPA, great weight should be given to interpretations of the FTC Act).

### c. To The Extent Knowledge Is Required, Plaintiffs Have Adequately Alleged It.

Even if Plaintiffs were required to allege Nissan's knowledge to state a claim under the FDUTPA, their allegations are more than adequate. Rule 9(b) provides that even in cases where the circumstances leading to the cause of action must be stated with particularity, a defendant's knowledge may be alleged generally. Consistent with that rule, Nissan has not been able to point to any instance where a FDUTPA claim was dismissed for inadequate allegations of knowledge. In fact, the auto defect cases discussed above, each of which were found to state a claim under the FDUTPA, included only generalized knowledge allegations. *See Sanchez-Knutson,* 2014 WL 5139306, at *2 (alleging that "Ford knew or should have known that the 2011 through 2013 model year Ford Explorers were dangerous and defective"); *Rothstein*, 2005 WL 3093573 at *2 (alleging "that [Chrysler] knew the braking system was defective"); *Collins*, 894 So. 2d at 989 (alleging "that Chrysler knew or should have known that the GEN-3 seatbelts were defective").

Plaintiffs go beyond those in *Sanchez-Knutson*, *Rothstein*, and *Collins*, not only alleging generally that Nissan knew of the dashboard defect (Compl., ¶ 23), but also explaining how the auto industry is well aware of the safety hazard posed by dashboard reflections and that Nissan had begun receiving complaints of melting dashboards as far back as 2006. (*Id.*, ¶¶ 25-28.) Nissan claims that the complaints it received in 2006 were not of melting dashboards, but of a different defect. It offers a copy of a "Customer Satisfaction Program" where it categorized the issue as "bubbling" on the dashboard. While the Court may take judicial notice of the existence of this document, the truth of its contents and

13

the appropriate interpretation of those contents remain in dispute—in particular, whether "bubbling" is different than "melting," or just a different way to describe what happens to dashboard material that was not properly formulated for use in Florida's sunlight and humidity.  *See* Fed. R. Evid. 201(b(2) (allowing judicial notice only of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (document attached to a motion to dismiss may not be considered unless "its contents are not in dispute").

Nissan asks the Court to draw every inference in its favor, and conclude at the pleading stage that it did not know that the dashboard material used in Plaintiffs' cars was defective and not suitable for prolonged use in Florida.  But when considering a motion to dismiss, the Court is required to accept Plaintiffs' allegations as true and construe them in the light most favorable to Plaintiffs—not in the light most favorable to Nissan.  *Edwards v. Prime, Inc.,* 602 F.3d 1276, 1291 (11th Cir. 2010).  And the allegations of Plaintiffs' complaint are that Nissan received complaints in 2006 from drivers who experienced the same melting dashboards that Plaintiffs later experienced, but nonetheless chose to continue selling class vehicles without altering the composition of the dashboards.  (Compl., ¶¶ 26-28.)  Other inferences that can be reasonably drawn from the complaint also support the allegation that Nissan knew of the dashboard defect but continued selling class vehicles anyway.  Over the past few years, Nissan has received hundreds if not thousands of complaints and its melting dashboards have drawn extensive media attention, yet Nissan continues to deny that a defect exists—admitting only to "isolated consumer complaints about the dashboard appearance."  (*Id.*, ¶ 30; *see also id.,* ¶¶ 14-22.)  The fact that Nissan has continued to deny the existence of a defect in the face of this mounting public evidence—and continues to sell used class vehicles through Nissan dealerships—lends credence to the notion that Nissan knew or should of known about the defect since 2006 (if not before) but chose to ignore the

issue.  This is not an unforeseeable defect and it is one that Nissan would have known about long before consumers started complaining.  Automakers and their suppliers conduct accelerated aging tests designed to simulate long-term exposure to extreme levels of sunlight, temperature, and humidity.  They also use a variety of early warning systems and statistical projections to detect potential problems in their vehicles long before the issue affects most drivers.  Nissan's contention that it never detected a defect and still does not know of any defect is, in Plaintiffs' view, not credible and certainly one that should not be accepted on a motion to dismiss.

### 2. Plaintiffs Satisfy the Element of Causation.

The second element of a FDUTPA claim is causation, which is an objective standard that asks "not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances." *Nivia v. Nationstar Mortgage*, LLC, No. 13-CIV-24080, 2014 WL 4146889, at *5 (S.D. Fla. Aug. 21, 2014) (quoting *Davis v. Powertel*, *Inc.,* 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000)).  The causation element thus raises a question of fact not well-suited for resolution on a motion to dismiss, which is likely why Nissan is not challenging whether Plaintiff Lucrezia has adequately alleged it.  The large number of consumer complaints, along with Mr. Lucrezia's statement that he himself was deceived and would not have bought his Nissan Altima if he'd known about the dashboard defect, suggest that Nissan's alleged omissions and unfair practice of selling defective vehicles would indeed deceive a reasonable consumer.

Nissan does challenge causation with respect to Plaintiff Sanborn, however.  It argues that because Ms. Sanborn is a secondary purchaser of a used vehicle, she "fails to establish a causal connection between [Nissan's] conduct in manufacturing and distributing the vehicle and her purchase from a dealer two years later." (Mot. at 17.)  But there is no material difference between Ms. Sanborn (a used-car purchaser) and Mr. Lucrezia (a new-car purchaser) in this case.  Neither bought directly from Nissan; they both bought from Nissan dealerships.  And had Nissan not distributed defective vehicles to

its dealerships (or had they informed the dealerships that the dashboards are not suitable to prolonged exposure in Florida climates), neither Ms. Sanborn nor Mr. Lucrezia would have been injured. (Compl., ¶ 56.) If anything, Nissan's conduct is arguably more deceptive to a reasonable used-car purchaser than it is to a reasonable new-car purchaser—if only because used vehicles have already been exposed to sunlight for a prolonged period of time and their dashboards are more likely to melt sooner.

### 3. Plaintiffs Have Suffered Actual Damages.

The final element of an FDUTPA claim is actual damages. Nissan argues that Plaintiffs cannot satisfy this element because they "fail to plausibly allege that [Nissan] obtained anything as a result of its alleged non-disclosure." (Mot. at 17.) Notwithstanding the fact that Nissan undoubtedly profits from its distribution of vehicles into the marketplace, Nissan's argument is misplaced. The FDUTPA's damages provision focuses on the loss suffered by the consumer, not on the gain achieved by the manufacturer. Fla. Stat. § 501.211(2). Thus, as in the *Collins* case involving defective seatbelts, Plaintiffs have satisfied the FDUTPA's actual-damage requirement because their vehicles are alleged to be worth less than had they been sold in defect-free condition. (Compl., ¶ 56); *Collins*, 894 So. 2d at 990 ("Florida courts have allowed diminished value to serve as 'actual damages' recoverable in a FDUTPA claim since at least *Rollins* in 1984)).

### D. Plaintiffs Have Alleged A Valid Claim for Unjust Enrichment.

Nissan requests that the Court dismiss Plaintiffs' unjust enrichment claim pursuant to the general rule that equitable remedies are not available when adequate legal remedies exist. (Mot. at 17-18.) The case law is mixed, but recent cases have followed the Eleventh Circuit's lead and held that the "rule does not apply to unjust enrichment claims," and that "[i]t is only upon a showing that an express contract exists [between the parties] that the unjust enrichment … count fails." *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*, 955 F. Supp. 2d 1311, 1337 (S.D. Fla. 2013) (quoting *State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.,* 427 Fed. Appx. 714, 722

16

(11th Cir. 2011) (per curiam), *rev'd in part on other grounds, State Farm Mut. Auto. Ins. Co. v. Williams,* 563 Fed. Appx. 665 (11th Cir. 2014)); *Marty v. Anheuser-Busch Companies, LLC*, No. 13-23656-CIV, 2014 WL 4388415, at *13 (S.D. Fla. Sept. 5, 2014) (same).

Nissan also renews its argument that Plaintiffs have not alleged how Nissan benefited from its alleged conduct, seeking dismissal of Plaintiffs' unjust enrichment claim on that ground as well.  In fact, Plaintiffs have alleged that Nissan profited from its conduct.  (Compl., ¶¶ 61-63.)  Had Nissan refrained from selling cars with defective dashboards, or had it disclosed the defect to the marketplace, it would have sold fewer cars and would have had to fix the defect or discount the vehicles to account for the defect.  The fact that consumers like Plaintiffs paid money to Nissan dealerships—rather than directly to Nissan—does not matter under the law of unjust enrichment.  What is important is that Nissan profited from inequitable conduct, and as a matter of justice should be required to refund that money to the consumers who are paying the price.  *See Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4901346, at *5 (S.D. Fla. Oct. 14, 2011) ("It would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the "benefit" passed through an intermediary before being conferred on a defendant."); *Garcia v. Kashi Co.*, No. 12-21678-CIV, 2014 WL 4392163, at *24 (S.D. Fla. Sept. 5, 2014) ("There can be no strict rule as to what constitutes unjust enrichment …. Everything depends on the circumstances of the individual case and whether or not the pleader has alleged facts which show that an injustice would occur if money were not refunded.").

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court deny Nissan's motion to dismiss their complaint.  Should the Court find that any portion of Nissan's motion has merit, Plaintiffs also request an opportunity to remedy the affected claims through an amended complaint.

**REQUEST FOR HEARING**

Plaintiffs request that the Court hold a hearing on Defendant's motion to dismiss. Plaintiffs believe a hearing would be particularly helpful in light of the unsettled questions regarding standing (outside the food and supplement mislabeling context) for product versions beyond those purchased by the named plaintiffs, and the parties' arguments regarding knowledge under the FDUTPA. Plaintiffs estimate that full argument would require 45-60 minutes.

Dated: January 26, 2015   Respectfully Submitted,

**GIRARD GIBBS LLP**

By: /s/ Amy Zeman
Amy Zeman (FL Bar No. 110653)
601 California Street, 14th Floor
San Francisco, California 94108
Telephone: (415) 981-4800
Fax: (415) 981-4846
Email: amz@girardgibbs.com

Gregory F Coleman (pro hac vice forthcoming)
**GREG COLEMAN LAW PC**
Bank of America Center
550 Main Avenue, Suite 600
Knoxville, TN 37902
Phone: (865) 247-0080
Fax: (865) 522-0049
Email: greg@gregcolemanlaw.com

John A. Yanchunis (FL Bar No. 324681)
James D. Young (FL Bar No. 567507)
MORGAN & MORGAN COMPLEX
LITIGATION GROUP
201 N. Franklin St. 7th Floor
Tampa, FL 33602-5157
Phone: (813) 275-5272
Fax: (813) 275-9295
Email: jyanchunis@forthepeople.com
        jyoung@forthepeople.com

*Attorneys for Plaintiffs and the Class*