## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 0:14-CV-62567

TRACY SANBORN and LOUIS
LUCREZIA, on behalf of themselves and all
others similarly situated,

                           **Plaintiffs,**

      v.

NISSAN NORTH AMERICA INC.,

                           **Defendant.**

### JOINT MOTION FOR PRELIMINARY APPROVAL OF
### CLASS SETTLEMENT AND SUPPORTING MEMORANDUM

Plaintiffs Tracy Sanborn and Louis Lucrezia and Defendant Nissan North America Inc.
hereby move this Court for an order that (i) preliminarily approves the parties' proposed class
settlement—a copy of which is attached to the accompanying declaration of Amy Zeman as
Exhibit 1 and cited herein as the "Settlement"; (ii) certifies the proposed settlement class
pursuant to Rule 23(b)(3); (iii) directs that the class be notified of the proposed settlement,
pursuant to Rule 23(c)(2) and Rule 23(e)(1), in the form and manner proposed by the parties; and
(iv) schedules a final fairness hearing, at which the Court will consider whether the settlement
should be finally approved and will consider class counsel's application for an award of attorney
fees and reimbursement of expenses.

### SUPPORTING MEMORANDUM

## I.     INTRODUCTION

This litigation began in late 2014, after reports of melting dashboards in 2008-2009
Nissan Altima vehicles began surfacing online and in the local media.  Altima owners like
Plaintiffs Tracy Sanborn and Louis Lucrezia complained that their dashboards were gradually
deteriorating.  More specifically, in various filings with the Court, Plaintiffs asserted that the
Class Vehicles had a dashboard with a plastic skin material made from a powder slush-molded

thermoplastic polyurethane that was not able to withstand prolonged exposure to the heat and humidity typical of Florida and that the skin material could degrade, resulting in the cracking, deforming, melting, bloating, out-of-the-ordinary softening, and stickiness of the skin of a dashboard on the Class Vehicles ("Deterioration" or "Deteriorated" or "Deteriorating"). Hundreds of Altima owners filed complaints with the National Highway Traffic Safety Administration (NHTSA). The remedy for the Deteriorated dashboard problem is a new dashboard made of hydrolysis-resistant material, but that new dashboard costs around $1,500 to $2,000 to install.

After a year and a half of litigation, and with the pre-trial calendar call scheduled to occur the following week, Plaintiffs and Nissan reached a proposed class action settlement that will allow Altima owners to obtain a new dashboard for $250, and will reimburse Altima owners who previously paid for new dashboards to the same extent. Plaintiffs, their counsel, and the Altima owners that they have spoken with to date believe this to be a fair deal that will adequately address the melting-dashboard issue and will do so sooner rather than later. This is particularly true given the many risks that Altima owners would face if litigation were to continue. In particular, Florida's rigorous 4-year statute of limitations threatens to deny recovery to most of the class. Nissan has moved for summary judgment on other grounds as well, has moved to exclude Plaintiffs' damages model, and has raised several challenges to class certification. But for the proposed settlement, these motions remain pending. Even if Plaintiffs were to overcome each of those risks and prevail at trial, it would likely take years of appellate proceedings before Altima owners would see any relief. The parties' proposed settlement will avoid both risk and delay, and will instead provide Altima owners with immediate relief for Deteriorated dashboards.

The parties accordingly request that the Court review their proposed settlement and raise any concerns it might have about the settlement's terms. If the Court does not see any problems that might lead it to deny final approval, the parties request that it preliminarily approve the settlement and enter the accompanying proposed order, which will allow the parties to notify class members of the settlement, solicit any objections class members might have, and set a schedule for final settlement approval.

## II.  HISTORY OF THE LITIGATION

### A.    The Pleadings

This litigation began in November 2014 with the filing of Plaintiff Tracy Sanborn's Class Action Complaint.  (11/11/14 Compl. [DE 1].)  Louis Lucrezia joined the suit in January 2015 when Plaintiffs filed their Amended Class Action Complaint.  (1/26/15 Am. Compl. [DE 23].)  In the pleadings, Plaintiffs alleged that Nissan had violated the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) and unjustly enriched itself by selling Altimas with dashboards that Deteriorate and appear to melt and cast additional glare after several years in the Florida climate.  (*Id.*, ¶¶ 1-3, ¶¶ 23-30.)  Plaintiffs claimed that Nissan knew or should have known that the dashboards were not suitable for long-term use in a hot and humid environment, and asked that Nissan be directed to disclose the dashboard defect, repair the defective dashboards, and reimburse Altima owners their out-of-pocket repair expenses.  (*Id.*, ¶¶ 3, 57, 64.)

Nissan moved to dismiss the case on the pleadings, but in June 2015, the Court largely denied Nissan's motion and permitted both of Plaintiffs' claims to proceed.  (6/15/15 Order [DE 44].)  The Court did, however, limit the class of Florida consumers only to 2008 and 2009 Nissan Altima vehicles.  (*Id.* at 3-5.)

### B.    Discovery

During fact discovery, which closed in January 2016, Plaintiffs propounded 28 document requests to assess what Nissan knew about the Altima's dashboard material and when it knew it, and subpoenaed four of Nissan's suppliers.  After Plaintiffs and their expert consultants had evaluated the document productions, Plaintiffs then deposed Nissan's corporate representative and five other Nissan employees who were involved with the Altima's dashboards.  During this time, each plaintiff also responded to 11 interrogatories and 7 documents requests from Nissan, and each sat for deposition.  Plaintiffs' fact discovery did not turn up evidence that Nissan knew about the dashboard defect when it first distributed the 2008 and 2009 Nissan Altima.  But in Plaintiffs' view, the evidence could be interpreted to show that Nissan should have known that the dashboard material was not properly formulated or tested, and that Nissan concealed the defect from the public when it did discover the defect.  (*See* Plfs. Opp. to MSJ [DE 153] at 2-7.)  Nissan vigorously contests Plaintiffs' view of the evidence.

Expert discovery proceeded until March 2016, and involved four experts retained by Plaintiffs and three by Nissan.  Plaintiffs retained an expert in automotive plastics, Dr. Anand

Kasbekar, who opined that the Altima dashboard material was poorly formulated and that Nissan would have known about the defect if it had properly tested the material prior to release.  (*Id.* at 4-5.)  They retained an expert in the automotive industry, Richard Diklich, who inspected Deteriorated dashboards and testified that the resulting degradation was extraordinary and created glare that, under certain situations, could serve to obstruct a driver's vision.  (*See* 01/29/16 A. Zeman Decl. [DE 80], Ex. 22 at 4-5.)  Plaintiffs also retained a survey expert, Dr. Melissa Pittaoulis, who conducted a conjoint study to assess how consumers' willingness to pay for a Nissan Altima would have been affected if they had been told that the vehicles' dashboards were defective.  (*Id.*, Ex. 39.)  And they retained a damages expert, Frank Bernatowicz, who used the conjoint results and other methods to estimate the damages to class members and the amount of Nissan's unjust enrichment at over $1000 per class vehicle.  (*Id.*, Ex. 32 at 19-20.)

For their part, Nissan retained an expert in the automotive industry, Thomas Bryant, who opined that Nissan acted reasonably and could not have known that its dashboard material would Deteriorate in the way that it did under the conditions that it did—just as the other manufacturers who used the same dashboard material in their vehicles could not have known.  (02/26/16 D. Rao Decl. [DE 84], Ex. 14.)  Nissan also retained two economics professors, Dr. David W. Harless and Dr. George E. Hoffer, who opined that many class members could not have suffered any loss and found no evidence that 2008-2009 Altimas had suffered from a loss of resale value as a result of the alleged dashboard defect.  (*Id.*, Ex. 25.)

### C.    **Motion Practice**

At the time of settlement, calendar call for trial was only a week away and two critical motions in the case remained pending: Plaintiffs' motion for class certification [DE 77]; and Nissan's motion for summary judgment [DE 127].

Nissan had opposed certification of any class of 2008-2009 Altima consumers on the grounds that the majority of the proposed class's claims were time-barred, and those whose claims were not time-barred were used purchasers and had no claims against Nissan; that the proposed class included owners and lessees with vehicles whose dashboards had not manifested any defect; and that Plaintiffs' damage theory did not and could not account for differences between class members (such as whether they bought new, bought used, leased, or sold their vehicle before any defect had manifested).  (2/26/15 Def. Opp. to Class Cert. [DE 85].)  For many of the same reasons, Nissan sought summary judgment against Plaintiffs and their

proposed class, and sought to exclude Plaintiffs' damages experts from presenting their survey findings and damage calculations at trial.  (Def. MSJ [DE 127].)  Nissan argued that Florida's four-year statute of limitations could potentially prevent most of the class from recovering, and that because Florida does not have a discovery rule, it does not matter that it took more than 4 years for the melting-dashboard defect to become apparent to consumers.  But Plaintiffs countered that, for reasons specific to this case, the statute of limitations did not apply.  *See* (3/9/16 Plfs. Mot. to Strike [DE 91].); (5/9/16 Plfs. Opp. to MSJ [DE 153] at 16-18.)  There were also pending numerous other vigorously contested motions dealing with a variety of topics including exclusion of expert testimony on both sides. *See* [DE 137]; [DE 140]; [DE. 135].

### D.   Settlement Negotiations

The parties exchanged mediation statements and participated in a full day of mediation with Michael C. Siboni in April 2016, but were unable to reach an agreement.  (4/27/16 Mediator's Report [DE 145].)  Subsequent to the mediation, Mediator Siboni continued his efforts to get the matter resolved and in June, as the parties also exchanged witness and exhibit lists, prepared the pre-trial stipulation and proposed jury instructions, and otherwise prepared for trial in July, the discussions became more fruitful.  In the evening of June 30, 2016—only a week before calendar call—the parties reached agreement on the material terms of the settlement now before the Court.  (7/1/16 Mediator's Report [DE 186].)

## III.   OVERVIEW OF THE SETTLEMENT

### A.   The Settlement Class

The parties' proposed settlement, if approved by the Court, would be binding on the following Settlement Class:

> All consumers who are residents of, and purchased or leased a new or used 2008 or 2009 Nissan Altima in, the State of Florida on or before April 1, 2017.  The Settlement Class excludes any people or businesses that did not purchase or lease the Class Vehicles as consumers, thereby excluding any automobile dealers of any kind or others who did not lease or purchase the Class Vehicles for ordinary consumer use.

(Zeman Decl., Ex. 1 ("Settlement"), ¶ 2.21.)

### B.   Replacement of Deteriorating Dashboards

Under the Settlement, each member of the Settlement Class ("Class Members") whose dashboards have undergone Deterioration may obtain a replacement dashboard from Nissan at a

net cost of $250. (*Id.*, ¶ 3.01.E.) Replacement of a Deteriorated dashboard was previously a repair that could range from $1,500 to $2,000 depending upon certain factors, so Nissan will be paying more than 80% of the repair cost and Class Members with melted dashes will be saving over $1,250. (*See* Zeman Decl., ¶ 6.) To obtain their replacement dashboards, Class Members will only need to present their vehicle at a Nissan dealership on or before April 29, 2017, and thereafter follow the Settlement's procedures. (Settlement, ¶ 3.01.E.) At that time, Class Members may either have their vehicle's dashboard replaced, or simply request that the dealership verify that their dashboard has Deterioration and then return at a later date—though no later than 120 days after the Court's final approval order becomes final. (*Id.*, ¶¶ 2.11(b); 3.01.E.)

### C.    Reimbursement for Prior Expenses

Class Members who have already paid to repair their Deteriorated dashboards may also obtain relief. Nissan will reimburse all but $250 of a class member's prior repair expenses. (*Id.*, ¶ 3.01.D.) For example, if a Class Member paid $1,500 for a dashboard replacement, Nissan would reimburse the class member $1,250. (*Id.*) Class Members will only need to complete, sign, and mail a simple claim form no later than 120 days after the Court's final approval order becomes final. (*Id.*, ¶ 3.01. D & F.) Nissan will make the initial determination of whether a claim for reimbursement is valid, but if Nissan denies a claim, Class Members will have the right to contest the decision through Class Counsel. (*Id.*, ¶ 3.01.F.) If after reviewing the class members' claim, Class Counsel believes the claim was improperly denied, they will first attempt to negotiate a resolution with Nissan's counsel; if the dispute remains unresolved, the parties will seek the input of Mediator Siboni, and if the parties are still unable to agree, Mediator Siboni will have the power to make a final and binding determination.

### D.    Release of Class Claims

In exchange for the relief Nissan is providing, Plaintiffs and the Settlement Class agree to dismiss all claims in the Amended Class Action Complaint with prejudice. (*Id.*, ¶ 5.01.) They will also release and covenant not to bring any claims against Nissan or its affiliates related to the subject matter of this lawsuit, including any claims concerning any alleged dashboard defect, denial of warranty coverage for the dashboard (referred to in the Settlement interchangeably as the instrument panel or dashboard), or alleged misrepresentations or omissions concerning the dashboard. (*Id.*) The Settlement will not, however, release any claims for personal injury,

wrongful death, or property damage (other than to the dashboard) that class members may have. (*Id.*)

      **E.**      **Notice and Claims Administration**

Nissan will pay all costs of administering the Settlement, including the cost of notifying Class Members about the Settlement.  (*Id.*, ¶ 3.01.A-C.)  If the Court preliminarily approves the Settlement, Nissan will mail Class Members a formal notice, which will describe the remedies available to them and afford them an opportunity to object to the proposed Settlement or opt out of the Settlement Class.  (*Id.*, ¶¶ 2.14; Proposed Order, Ex. A & B.)  Nissan will also make the class notice available on a settlement website that it will pay for and maintain.  (*Id..*)

      **F.**      **Attorney Fees, Costs, and Incentive Awards**

After the parties had reached agreement on a settlement of the class's claims, they proceeded to negotiate Class Counsel's claim for fees and expenses under the FDUTPA. (Zeman Decl., 4.)  The FDUTPA authorizes the prevailing party to apply for and recover reasonable attorney fees and costs, and to date Class Counsel has incurred a lodestar in excess of $1,900,000.00, and over $350,000.00 in litigation costs.  Fla. Stat. § 501.2105; (Zeman Decl., ¶ 5.)  With Mediator Siboni's assistance, the parties resolved that claim subject to Court approval.  They agreed that Class Counsel will petition the Court to award $1.3 million in attorney fees and up to $348,000 in costs so long as those costs are approved by Mediator Siboni after reviewing documentation submitted by Class Counsel.  (Settlement, ¶ 3.01.H.)  In exchange for Plaintiffs not seeking a higher amount, Nissan has agreed not to oppose Class Counsel's application and to pay the fee and cost award within 45 calendar days of Court approval becoming final.  (*Id.*, ¶¶ 3.01.H, 3.02.)  In addition, Class Counsel will petition the Court to award $5,000 incentive payments to both Plaintiff Sanborn and Plaintiff Lucrezia in recognition of their services representing Altima owners over the past two years.  (*Id.*)  Nissan has agreed to pay these amounts subject to Court approval.  (*Id.*)

**IV.**    **CERTIFICATION OF THE SETTLEMENT CLASS**

When presented with a class settlement prior to a decision on class certification, the Court must first determine whether the proposed settlement class satisfies the requirements of Rule 23(a) and one of the subsections of Rule 23(b).  *Fresco v. Auto Data Direct, Inc.*, No. 03-61063-CIV, 2007 WL 2330895, at *2 (S.D. Fla. May 14, 2007).  The class must also be adequately

defined and the proposed class representatives must possess Article III standing. *Outten v. Capital Mgmt. Servs., L.P.*, No. 09-22152-CIV, 2010 WL 2194442, at *1 (S.D. Fla. Apr. 9, 2010). The parties had strong differences in their views of whether the class that had been proposed at the certification stage should have been properly certified. However, given the composition of the proposed settlement class, Nissan agrees that the class is properly constituted for settlement purposes only.

Here, the Settlement Class set forth in the Settlement meets each of the requirements set out above and therefore may be certified for settlement purposes. In subsections A and B below, Plaintiffs reiterate the primary arguments that were made in support of class certification and, as noted, while Nissan agrees that the settlement class is proper for settlement purposes, it does not subscribe to the points below outside of the particular context of this settlement.

### A.     Class Definition and Standing

"Before establishing the explicit requirements of Rule 23(a), a plaintiff must first establish that the proposed Class is 'adequately defined and clearly ascertainable.'" *Randolph*, 303 F.R.D. at 684. This "ascertainably" requirement asks (i) whether members of the proposed class "can be ascertained by reference to objective material," and (ii) whether analysis of that objective criteria is "administratively feasible," such that "identifying class members [would be] a manageable process that does not require much, if any, individual inquiry." *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014). The class definition proposed here meets those requirements, as it uses objective terms—namely, the purchase or lease of an 2008-2009 Nissan Altima by Florida residents—that can be readily assessed by Nissan and the consumers themselves to identify members of the Settlement Class. (*See also* 1/29/16 Zeman Decl. [DE 77-2], Ex. 35 (Miller Dep.) at 28:10-12, 123:17-124:4.)

In addition, Plaintiffs Sanborn and Lucrezia have demonstrated that they have standing to seek relief in this case: they have suffered an injury in the form of melted dashboards, that injury was allegedly caused by Nissan's conduct, and their injuries may be redressed by a judgment in their favor. *See Outten*, 2010 WL 2194442 at *2. In fact, the Court has previously conducted a standing analysis in connection with Nissan's motion to dismiss, and concluded that Plaintiffs have standing to bring claims related to the purchase of 2008-2009 Nissan Altima vehicles. (*See* 6/15/15 Order [Doc. 44] at 4-5.)

**B.**     **The Rule 23(a) Requirements**

The prerequisites for class certification under Rule 23(a) are (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation, each of which is satisfied here.  Fed. R. Civ. P. 23(a); *Carriuolo v. Gen. Motors Co.*, No. 15-14442, 2016 WL 2870025, at *3 (11th Cir. May 17, 2016).

**1.     Numerosity**

The Settlement Class encompasses approximately 42,000 vehicles and so readily satisfies the numerosity requirement.  (*See* 1/29/16 Zeman Decl. [DE 77-2], Ex. 36 at 4); *Outten*, 2010 WL 2194442 at *2 ("As a general rule, a class of less than 21 members is inadequate, and a class of more than 40 members is adequate.").

**2.     Commonality**

The Settlement Class also satisfies Rule 23(a)'s commonality requirement, which is a relatively light burden that requires only that "that there be at least one issue whose resolution will affect all or a significant number of the putative class members."  *Carriuolo*, 2016 WL 2870025 at *3 (quoting *Williams v. Mohawk Indus., Inc*., 568 F.3d 1350, 1355 (11th Cir. 2009)).  Here, class members' claims share a number of issues in common, including (i) whether the dashboard material installed in 2008-2009 Nissan Altimas was defective; (ii) whether Nissan failed to properly formulate, test, or disclose the suitability of its dashboard material for use in Florida conditions; and (iii) whether that conduct would be considered deceptive or unfair by a reasonable consumer.  *See Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 537 (S.D. Fla. 2015) (commonality satisfied because the question of whether Ford sold vehicles with a defective condition is common to all class members); *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 693 (S.D. Fla. 2014) (commonality satisfied because the issue of deceptiveness under the FDUTPA is common to all class members).

**3.     Typicality**

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  In general, "[t]he claim of a class representative is typical if 'the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'"  *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009).  That requirement is satisfied here,

where Plaintiffs' claims—like those of the rest of the Settlement Class—arise from the same alleged failure by Nissan to adequately formulate, test, or disclose the suitability of the Altima's dashboard material for use in Florida conditions, and they seek relief under the same legal theory that Nissan's conduct violated the FDUTPA and unjust enrichment law.

### 4.    Adequacy

Adequacy, the final Rule 23(a) requirement, "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008) (citation omitted).  Here, the alleged conduct toward the two Plaintiffs is identical to other Altima owners; thus, no inherent conflict exists.  *Outten*, 2010 WL 2194442 at *4.  And both Plaintiffs and their counsel have demonstrated through nearly two years of litigation that they are committed to the class and will vigorously pursue their interests.  (*See also* 1/29/16 Zeman Decl. [DE 77-2], Ex. 37-38 (firm resumes of class counsel).)

### C.    Rule 23(b)(3) Requirements

### 1.    Predominance

Rule 23(b)(3)'s predominance requirement is satisfied if common issues exist and they would predominate over any individualized issues.  *Klay v. Humana, Inc.,* 382 F.3d 1241, 1254 (11th Cir. 2004).  The central questions raised by this lawsuit—namely whether the Altima's dashboard material is defective and, if so, whether Nissan's failure to adequately formulate, test, or disclose the suitability of the dashboard material for use in Florida conditions was unfair or deceptive—are common for all class members.  *See Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 537 (S.D. Fla. 2015) (finding predominance requirement satisfied where class members alleged a common defect).  And even though class members' damages may have differed depending on their individual circumstances, "individualized damages calculations are insufficient to foreclose the possibility of class certification, especially when, as here, the central liability question is so clearly common to each class member." *Carriuolo*, 2016 WL 2870025 at *7.

### 2.    Superiority

Lastly, Rule 23(b)(3)'s superiority requirement is satisfied, as resolving the parties' dispute through a single class action is preferable to a series of individual lawsuits.  The amount

of damages at stake is relatively small at the individual level—ranging from about $1,200 in lost market value to $2,000 in repair costs—and so it would be inefficient and impractical for class members to pursue relief separately. *Sanchez-Knutson*, 310 F.R.D. at 541 ("the number of class members here—in the hundreds or thousands—is too large for the prosecution of separate actions by each class member to be likely, practical, or desirable"). And while management problems can sometimes override the collective benefits of a class action, that will not be the case here since the parties propose resolving the case by settlement rather than through trial. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

## V.   PRELIMINARY SETTLEMENT APPROVAL

Before the Settlement can be approved, Class Members who will be bound by its terms must be notified and given an opportunity to object. Fed. R. Civ. P. 23(e). This notification process takes time and can be costly, so it has become customary for courts to conduct a preliminary fairness review before the parties embark on the lengthy and expensive process of notifying class members of the settlement. *See* Newberg on Class Actions § 13:10 (5th ed.); *Fresco*, 2007 WL 2330895 at *4. If the Court has any concerns about the proposed settlement that may lead it not to grant final approval, the preliminary approval process provides the Court with an opportunity to raise those concerns immediately. The parties can then either address those concerns before notice is disseminated or return to litigation without further delay.

In assessing whether a proposed class settlement is fair, adequate, and reasonable, the following factors are typically considered:

    (1) the likelihood of success at trial;
    (2) the range of possible recovery;
    (3) the range of possible recovery at which a settlement is fair, adequate, and reasonable;
    (4) the anticipated complexity, expense, and duration of litigation;
    (5) the opposition to the settlement; and
    (6) the stage of proceedings at which the settlement was achieved.

*Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2011). Courts also consider whether the settlement appears to be a legitimate, arm's-length deal, or whether it is driven by fraud or collusion. *Wilson v. EverBank*, No. 14-CIV-22264, 2016 WL 457011, at *6 (S.D. Fla. Feb. 3, 2016) (citing *Leverso v. SouthTrust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994)).

The extent and substance of any opposition to the settlement cannot be fully evaluated until class notice has been disseminated, but in Plaintiffs' view, the remaining factors confirm the Settlement to be advantageous to the class and worthy of judicial approval.

### 1.    Likelihood of Success

At the time of the Settlement, there was no order certifying the class and there was a pending motion for summary judgment by Nissan.  If either of those decisions by this Court were wholly adverse to the Plaintiffs, the Class Members would have recovered nothing absent overturning those decisions on appeal.  Had this case proceeded to trial in July rather than settling, Plaintiffs were optimistic about their chances of establishing liability.  Nissan had a different view.  Plaintiffs were prepared to present what they viewed as a strong factual case, having pieced together what they perceived as a compelling narrative that while Nissan may not have possessed actual knowledge of the dashboard defect prior to selling Altima vehicles to consumers, it should have known that its dashboard material required stabilizers to prevent hydrolysis; that Nissan's verification testing was inadequate and therefore failed to uncover the defect prior to release; and that when Nissan discovered the defect in other vehicle models, it failed to fix the problem in previously-sold Altimas and concealed the issue from Altima owners.  Nissan would have argued that much of what Plaintiffs wanted to show the jury was legally irrelevant and never should have reached the jury.  Moreover, even if that evidence was presented to the jury, Nissan would have argued that it did nothing improper, that it reasonably relied upon sophisticated third party suppliers and that even other sophisticated automotive companies purchased dashboards that had the same chemical composition.  Moreover, Nissan would have argued that it had no obligation to fix dashboards that melted outside of warranty. There was, of course, a risk that the jury would side with Nissan and find nothing unfair or deceptive in its conduct, but the real risk to Plaintiffs and the class lay in Nissan's legal defenses.

Nissan's statute-of-limitations argument, in particular, threatened to leave almost the entire class with no chance of a recovery.  Because it generally took 4-6 years before Altima dashboards began melting, it was not possible for most original purchasers and lessees of 2008-2009 Altima vehicles to file a class action before the 4-year statute of limitations had run.  In similar situations, other states toll the statute of limitations under the delayed discovery doctrine, but Florida is an exception and rigorously applies its 4-year statute of limitations in situations like this one.  *See Matthews v. Am. Honda Motor Co.*, No. 12-60630-CIV, 2012 WL 2520675, at

*3 (S.D. Fla. June 6, 2012); *Licul v. Volkswagen Grp. of Am., Inc.*, No. 13-61686-CIV, 2013 WL 6328734, at *6 (S.D. Fla. Dec. 5, 2013); *Speier-Roche v. Volkswagen Grp. of Am. Inc.*, No. 14-20107-CIV, 2014 WL 1745050, at *6-7 (S.D. Fla. Apr. 30, 2014).  Plaintiffs did have case-specific counter-arguments but historically, similar counter arguments have had little record of success in Florida courts.  *See id.*  And if Nissan won on its statute-of-limitations arguments, most of the class's claims would be time-barred.  Only those consumers who purchased used Altimas after November 2010 would have live claims, and once isolated, it would be difficult for those consumers to establish that Nissan owed a legal duty to used purchasers or to detect and measure any damages to the secondary market.

Nissan also had asserted an array of other legal defenses that introduced additional risk for Plaintiffs and the Class Members.  Each of these issues had been fully briefed but not yet decided by the Court, and there was at least some chance that the Court would ultimately find one of the arguments persuasive.  For example, the Court could have held that Nissan could not be held liable under the FDUTPA unless Plaintiffs demonstrated it had actual knowledge of the defective dashboards before selling Nissan Altimas to the class—something that Plaintiffs could not do.  (Nissan's MSJ [DE 127] at 5-8.)  Or the Court could have found that Plaintiffs should be precluded from presenting their damages model at trial because their experts' conjoint study did not adequately account for used purchasers, lessees, and consumers whose dashboards did not melt.  (Nissan's Daubert Motion [DE 137] at 11-16.)  Put simply, Nissan contended that Plaintiffs' models only proved hypothetical rather than actual damages and that they should, accordingly, be barred.  It was far from certain that Plaintiffs would even be permitted to try their case on a class-wide basis, as Nissan had argued that its defenses and the difficulty of proving damages would override any efficiency gains to be had from trying liability on a class-wide basis.  (Nissan's Opp. to Class. Cert. [DE 85] at 7-17.)

All this is not to say that Plaintiffs could not have prevailed at trial.  They continue to believe that the facts are on their side, and that as an equitable matter, Altima owners should not be stuck with the choice between a melted dashboard and a $1,500 repair.  But from a legal perspective, it was a challenging case to even get to trial and many legal obstacles still remained in Class Members' way.

2.      **The Range of Possible Recovery**

As discussed above, Nissan's statute-of-limitations defense and other legal arguments made it quite possible that Plaintiffs and class members would recover nothing.  If they were to make it to the damages phase of trial, however, they would have asked the jury to award them damages of between $1,111 and $1,280 per class vehicle.  (01/29/16 A. Zeman Decl. [DE 80], Ex. 32 at 19-20.)  So the most that any given class member could reasonably have expected to receive (excluding any award of pre-judgment interest) if the case had continued through trial was $1,280.

3.      **The Range of Recovery At Which Settlement Is Fair, Adequate, and Reasonable.**

Under the proposed settlement, Nissan will pay all but $250 of the cost of replacement dashboards for class vehicles with melted dashes.  Because a dashboard replacement typically costs $1,500 to $2,000, that means Nissan is paying around $1,250 to $1,750 for each repair.  This compares favorably to the $1,111 to $1,280 that Plaintiffs were seeking.  For Class Members who have already paid for dashboard replacements, the Settlement therefore provides relief close to the maximum they could have recovered through a successful verdict.

The primary difference between the Settlement and the relief Plaintiffs were seeking is how Class Members who have not paid for a dashboard replacement are handled.  Without a Settlement, there was not a feasible way to separate (i) those Altima owners who suffered from melting dashboards but did not pay for a replacement due to the high cost from (ii) those Altima owners whose dashboards never melted.  It would have required individual inspections, which typically results in denial of class certification and leaves consumers to fend for themselves.  *See Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1141 (Fla. Dist. Ct. App. 2008).  Plaintiffs therefore proposed that the jury award the same amount for each class vehicle, regardless of whether its dashboard ultimately melted.  As Nissan argued repeatedly, this Court has previously found that it is inappropriate to seek relief for consumers with manifested defects as well as for consumers whose product has performed satisfactorily.  *Breakstone v. Caterpillar, Inc.*, No. 09-23324-CIV, 2010 WL 2164440, at *6 (S.D. Fla. May 26, 2010) (Moore, C.J.).  Plaintiffs believe that there is support for the countervailing view, based on Florida law that allows damages to be measured at the point of sale.  *See Collins v. DaimlerChrysler Corp.,* 894 So. 2d 988, 990 (Fla. Dist. Ct. App. 2004).  Under that case law, damages could be awarded based on the difference

between the market value of a Nissan Altima with dashboard material that might melt in Florida conditions and the market value of a Nissan Altima with dashboard material that is not susceptible to melting in Florida conditions.  That measure of damages does not depend on whether a defect has actually manifested itself, but it requires that Plaintiffs be able to reliably estimate how the possibility of a dashboard melting in 4-6 years would affect the market value of a vehicle at the time of sale.  Plaintiffs attempted to measure this through a conjoint study, which uses survey data to gauge how consumers' willingness to pay is affected by certain variables.  It is necessarily an inexact science that relies on averages and other statistical methods, and while the method has been accepted for *Daubert* purposes in other cases, Nissan  vigorously opposed its use and, if that evidence did reach the jury, the jury would still need to accept both that Altima owners whose dashboards never melted still suffered damages and that Plaintiffs' experts had accurately estimated the extent of those damages.

The Settlement resolves the difficulties of measuring market-value effects and avoids the somewhat counter-intuitive result of providing the same relief regardless of whether a given dashboard has melted or functioned properly.  By agreeing to a process for vehicles with Deterioration to be identified and replaced—with Nissan bearing more than 80% of the cost— Plaintiffs were able to overcome the limitations inherent in a class-wide damages model.  While Nissan will pay less than if it was ordered to compensate every Altima owner, regardless of whether they actually suffered from a melting dashboard, the Settlement ensures that those class members who most need a remedy receive one.  Based on the difficulties the class would face proving liability as well as proving damages on a class-wide basis, Plaintiffs believe this to be a fair compromise that accomplishes the primary purpose of the lawsuit.  (*See* 1/26/15 Am. Compl. [DE 23], ¶ 3 (requesting that Nissan be directed to disclose the dashboard defect, repair the defective dashboards, and reimburse Altima owners their out-of-pocket repair expenses).  That is particularly so given that Nissan's various defenses could well leave Class Members with nothing.  *See Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005) (even a settlement that offers only 0.01% or 0.001% of the potential recovery can be fair when strong defenses are present).  In light of the significant risk that continued litigation poses to Class Members, and the fact that the Settlement offers $1,250 to $1,750 in reimbursements and repairs to Class Members who experienced Deterioration, Plaintiffs believe the Settlement falls well within the possible range of recovery that could be considered fair, adequate, and reasonable.

### 4.     The Anticipated Complexity, Expense, and Duration of Litigation

As discussed in the preceding sections, this litigation involves a number of thorny legal issues, many of which have yet to be resolved.  The case's complexity means that there are many ways for class members to lose, and is one of the primary reasons that Plaintiffs are in favor of a negotiated resolution rather than continued litigation.  In addition, even if Plaintiffs were to prevail on each of the legal issues currently before the Court and then prevail before the jury, Nissan would be certain to file an appeal that would be equally complex and could take years to resolve.  The melting dashboard issue came to prominence in 2014, and many consumers have been waiting years for assistance.  Continued litigation would mean that these Altima owners would have to wait even longer, and by the time that the case proceeded through trial and the ensuing appeals, any relief that Plaintiffs ended up obtaining would be that much less useful.  This is a case where the timeliness of relief is as important, if not more important, than the amount of that relief.  One of the greatest virtues of the Settlement, therefore, is not just that it offers class members who experienced Deterioration considerable relief—but that it does so sooner rather than later.

### 5.     The Substance and Amount of Opposition to the Settlement

The Class Members have yet to be formally notified about the Settlement and given a chance to lodge any objections, so this factor cannot be fully evaluated at this time.  But Class Counsel have been contacted by hundreds of Class Members since they began investigating melting dashboards, and so were able to consult with at least some of the Class Members before negotiating and agreeing to the Settlement.  As a result of their conversations with various class members, Class Counsel had a good sense of the amounts that Altima owners would be able and willing to pay to repair their dashboards with Deterioration.  (Zeman Decl., ¶ 7.)  Those conversations also underscored how important it was for class members to obtain relief sooner rather than later.  (*Id.*)  So while a full assessment of the class's reaction to the Settlement will need to await the receipt of objections or other comments, if any, after notice, the initial class reaction was positive and helped to confirm for Class Counsel that the Settlement was a deal worth making.

### 6.     The Stage of Proceedings At Which Settlement Was Achieved

"The stage of the proceedings at which a settlement is achieved is evaluated to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and

weigh the benefits of settlement against further litigation." *Lipuma*, 406 F. Supp. 2d at 1324. Here, there can be little doubt that both sides were well aware of the relevant facts, the strengths and weaknesses of their respective legal positions, and the risks and advantages of continued litigation.  Discovery closed earlier this year, the parties had briefed every major issue in the case—through class certification, summary judgment, *Daubert*, and in limine motions, among others—and each side was in the midst of their final trial preparations when the case settled. (*See* Sections II.A-C, *infra*.)

### 7.    Absence of Fraud or Collusion

In addition to considering whether the Settlement is substantively fair to the Class Members, the Court should also ensure that it was negotiated at arm's length rather than collusively.  *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014). Here, the case was hotly contested for nearly two years, the parties were unable to reach agreement at an April 2016 mediation, and ultimately resolved the case only after several weeks of negotiations conducted through Mediator Michael C. Siboni.  (Zeman Decl., ¶ 3.)  In addition, there is nothing in the Settlement that suggests that Plaintiffs or their counsel compromised class interests to benefit themselves.  Attorney fees were negotiated only after the terms of class relief were reached, and the ultimate agreement between the Parties calls for Class Counsel to receive materially less than their lodestar in attorney fees.  (*Id.*, ¶ 5, Settlement, ¶ 3.01.H); *See Rogers v. Nacchio*, No. 05-60667-CIV, 2007 WL 1064314, at *4 (S.D. Fla. Apr. 6, 2007) (FDUTPA attorney fees are calculated using the lodestar method); *Barnhill v. Florida Microsoft Anti-Trust Litig.*, 905 So. 2d 195, 200 (Fla. Dist. Ct. App. 2005) (approving 1.77 lodestar multiplier under the FDUTPA).  Similarly, the $5,000 incentive awards that Nissan agreed to pay the named plaintiffs are not excessive and fall within the range typically approved by courts.  *See, e.g.*, *Fresco*, 2009 WL 9054828 at *6 (approving $15,000 service/incentive awards for each plaintiff); *Curry v. AvMed, Inc.*, No. 10-CV-24513-JLK, 2014 WL 7801286, at *3 (S.D. Fla. Feb. 28, 2014) (approving $5,000 incentive awards for each plaintiff).

## VI.    CLASS NOTICE

### A.    Method of Notice

The federal rules require that before finally approving a class settlement, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e).  Where the settlement class is certified pursuant to Rule

23(b)(3), the notice must also be the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

The parties have agreed on a notice plan that would provide class members with individual notice by first class mail, and will establish a settlement website where class members can obtain more information about the settlement. (*See* Settlement, ¶¶ 2.14; Proposed Order, Ex. A & B.) Plaintiffs request that the Court approve this method of notice as the best practicable under the circumstances. *See Curry,* 2014 WL 7801286 at *1 (approving similar method of notice).

### B. Form of Notice

The notice provided to class members should "clearly and concisely state in plain, easily understood language" the nature of the action; the class definition; the class claims, issues, or defenses; that the class member may appear through counsel; that the court will exclude from the class any member who requests exclusion; the time and manner for requesting exclusion; and the binding effect of a class judgment on class members. Fed. R. Civ. P. 23(c)(2)(B). The form of notice proposed by the parties complies with those requirements. Class members will receive a postcard in the mail designed to catch their attention and alert them to the settlement and available remedies. (*See* Proposed Order, Ex. A.) It will also direct them to the Settlement Website, where more information—including detailed long-form notice and other case documents—will be made available. (*See id.*, Ex. B.) Plaintiffs believe that this is the most effective way to alert class members to the existence of the settlement and convey detailed information about the settlement approval process, and accordingly ask that the Court approve the proposed forms of notice. *See Gevaerts v. TD Bank,* No. 1:14-CV-20744-RLR, 2015 WL 6751061, at *4 (S.D. Fla. Nov. 5, 2015) (approving simplified postcard notice and long-form notice with more detailed information).

## VII.   FINAL APPROVAL SCHEDULE

The next steps in the settlement approval process are to schedule a final approval hearing and set a briefing schedule, notify the class of the Settlement and hearing, allow Class Members an opportunity to file any objections or comments regarding the Settlement, and allow the parties to conduct appropriate objector discovery. *See, e.g.*, *Legg v. E-Z Rent A Car, Inc.*, No. 614-CV-1716-ORL, 2015 WL 10818745, at *3 (M.D. Fla. May 28, 2015) (authorizing parties to depose

objectors); *Montoya v. PNC Bank, N.A.*, No. 14-20474-CIV, 2016 WL 1529902, at *19 (S.D. Fla. Apr. 13, 2016) (discussing value of objector depositions).

The Parties have not yet obtained the addresses necessary for all of the Class Members but are currently undertaking efforts to do so.  Because this particular set of Class Members is composed of all people in the chain of ownership—as opposed to just original purchasers or current owners—it is a more difficult list to compile.  Moreover, some of the governmental entities with the necessary information sometimes will not compile and release the information before the court issues its order granting preliminary approval.  With those caveats, the Parties propose the following schedule:

| | |
|---|---|
| Last day to mail CAFA Notice | July 22, 2016--Completed |
| Last day to mail Class Notice | September 30, 2016 |
| Plaintiffs file Final Approval Motion | October 14, 2016 |
| Plaintiffs file Fee Application | October 14, 2016 |
| Last day to object or opt-out | November 15, 2016 |
| Parties file reply papers | December 1, 2016 |
| Final Approval and Fee Hearing | December 8, 2016 |

## VIII.   CONCLUSION

For the foregoing reasons, the parties respectfully request that the Court enter the accompanying Proposed Order granting preliminary approval of the proposed Settlement, certifying the settlement class, directing dissemination of class notice, and setting a hearing for the purpose of deciding whether to grant final approval of the settlement.

//

//

//

Dated: July 29, 2016                    Respectfully Submitted,

**GIBBS LAW GROUP LLP**

By:_____/s/ Amy M. Zeman_____

Amy Zeman (FL Bar No. 110653)
3711 Sheridan Ave
Miami Beach, FL 33140
T:  (510) 350-9721 F:  (510) 350-9701
Email:  amz@classlawgroup.com


Eric H. Gibbs (admitted pro hac vice)
505 14th Street, Suite 1110
Oakland, CA  94612
T: (510) 350-9700  F: (510) 350-9701
Email:  ehg@classlawgroup.com


Gregory F Coleman (admitted pro hac vice)
Adam Edwards (admitted pro hac vice)
**GREG COLEMAN LAW PC**
800 South Gay Street, Suite 1100
Knoxville Tennessee 37929
T:  (865) 247-0080  F: (510) 350-9701
Email:  greg@gregcolemanlaw.com
         adam@gregcolemanlaw.com


John A. Yanchunis (FL Bar No. 324681)
James D. Young (FL Bar No. 567507)
**MORGAN & MORGAN**
201 N. Franklin St. 7th Floor
Tampa, FL  33602-5157
Phone:  (813) 275-5272
Fax:  (813) 275-9295
Email:  jyanchunis@forthepeople.com
         jyoung@forthepeople.com

*Attorneys for Plaintiffs*

JENNER & BLOCK LLP

By:    /s/ Peter J. Brennan_____
Peter J. Brennan (*pro hac vice*)
pbrennan@jenner.com
353 N. Clark Street
Chicago, IL 60654-3456
Phone: 312-222-9350; Fax: 312-527-0484

Devi M. Rao (*pro hac vice*)
drao@jenner.com
1099 New York Avenue NW, Suite 900
Washington, DC 20001-4412
Phone: 202-637-6390; Fax: 202-639-6066

BOWMAN AND BROOKE, LLP

John C. Seipp, Jr. (Fl. Bar No. 0289264)
Donald A. Blackwell (Fl. Bar No. 370967)
Two Alhambra Plaza, Suite 800
Coral Gables, Florida 33134
Phone: 305-995-5600; Fax: 305-995-6090

*Counsel for Nissan North America, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2016, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States District Court, Southern District of Florida, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: July 29, 2016

**GIBBS LAW GROUP LLP**

By:_____/s/ Amy M. Zeman_____

Amy Zeman (FL Bar No. 110653)
3711 Sheridan Ave
Miami Beach, FL 33140
T:  (510) 350-9721 F:  (510) 350-9701
Email:  amz@classlawgroup.com