**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 0:14-CV-62567**

TRACY SANBORN and LOUIS
LUCREZIA, on behalf of themselves and all
others similarly situated,

                              Plaintiffs,

        v.

NISSAN NORTH AMERICA INC.,

                              Defendant.

**JOINT MOTION FOR FINAL APPROVAL OF**
**CLASS SETTLEMENT AND SUPPORTING MEMORANDUM**

## TABLE OF CONTENTS

SUPPORTING MEMORANDUM ................................................................................................ 1

I.    INTRODUCTION ......................................................................................................... 1

II.   HISTORY OF THE LITIGATION ............................................................................. 2

  A.   The Pleadings ..................................................................................................... 2

  B.   Discovery ............................................................................................................ 2

  C.   Motion Practice .................................................................................................. 3

  D.   Settlement Negotiations ..................................................................................... 4

III.  OVERVIEW OF THE SETTLEMENT ....................................................................... 4

  A.   The Settlement Class .......................................................................................... 4

  B.   Replacement of Deteriorating Dashboards ....................................................... 5

  C.   Reimbursement for Prior Expenses ................................................................... 5

  D.   Release of Class Claims ..................................................................................... 6

  E.   Notice and Claims Administration ..................................................................... 6

  F.   Attorney Fees, Costs, and Incentive Awards ..................................................... 6

IV.   ARGUMENT ................................................................................................................. 7

    1.   Likelihood of Success ................................................................................. 7

    2.   The Range of Possible Recovery ................................................................ 9

    3.   The Range of Recovery At Which Settlement Is Fair, Adequate,  and Reasonable. ....... 9

    4.   The Anticipated Complexity, Expense, and Duration of Litigation ........... 11

    5.   The Substance and Amount of Opposition to the Settlement .................... 12

    6.   The Stage of Proceedings At Which Settlement Was Achieved ................. 12

    7.   Absence of Fraud or Collusion ................................................................. 12

V.    CONCLUSION ............................................................................................................. 13

# TABLE OF AUTHORITIES

## Cases

*Barnhill v. Florida Microsoft Anti-Trust Litig.*,
    905 So. 2d 195 (Fla. Dist. Ct. App. 2005) ............................................................. 13
*Breakstone v. Caterpillar, Inc.*,
    No. 09-23324-CIV, 2010 WL 2164440 (S.D. Fla. May 26, 2010) ......................... 10
*Collins v. DaimlerChrysler Corp.*,
    894 So. 2d 988 (Fla. Dist. Ct. App. 2004) ........................................................... 10
*Curry v. AvMed, Inc.*,
    No. 10-CV-24513-JLK, 2014 WL 7801286 (S.D. Fla. Feb. 28, 2014) ................... 13
*Faught v. Am. Home Shield Corp.*,
    668 F.3d 1233 (11th Cir. 2011) ............................................................................... 7
*Kia Motors Am. Corp. v. Butler*,
    985 So. 2d 1133 (Fla. Dist. Ct. App. 2008) ......................................................... 10
*Leverso v. SouthTrust Bank of Ala., N.A.*,
    18 F.3d 1527 (11th Cir. 1994) ................................................................................. 7
*Licul v. Volkswagen Grp. of Am., Inc.*,
    No. 13-61686-CIV, 2013 WL 6328734 (S.D. Fla. Dec. 5, 2013) ............................ 8
*Lipuma v. Am. Express Co.*,
    406 F. Supp. 2d 1298 (S.D. Fla. 2005) ............................................................. 11, 12
*Matthews v. Am. Honda Motor Co.*,
    No. 12-60630-CIV, 2012 WL 2520675 (S.D. Fla. June 6, 2012) ............................ 8
*Rogers v. Nacchio*,
    No. 05-60667-CIV, 2007 WL 1064314 (S.D. Fla. Apr. 6, 2007) ........................... 13
*Saccoccio v. JP Morgan Chase Bank, N.A.*,
    297 F.R.D. 683 (S.D. Fla. 2014) ........................................................................... 12
*Speier-Roche v. Volkswagen Grp. of Am. Inc.*,
    No. 14-20107-CIV, 2014 WL 1745050 (S.D. Fla. Apr. 30, 2014) ........................... 8
*Fresco v. Automotive Directions, Inc., et al.*,
    No. 03-CIV-61063, 2009 WL 9054828 (S.D. Fla. Jan. 20, 2009) ......................... 13
*Wilson v. EverBank*,
    No. 14-CIV-22264, 2016 WL 457011 (S.D. Fla. Feb. 3, 2016) ............................... 7

## Statutes

Fla. Stat. § 501.2105 ..................................................................................................... 6

## Rules

Fed. R. Civ. P. 23(e)(2) .................................................................................................. 7

ii

Plaintiffs Tracy Sanborn and Louis Lucrezia and Defendant Nissan North America Inc. hereby move this Court for an order granting final approval to the parties' proposed class settlement.  For the Court's convenience, an additional copy of the parties' signed settlement agreement, cited herein as the "Settlement," is attached to hereto as Exhibit A.

### SUPPORTING MEMORANDUM

## I.  INTRODUCTION

On August 10, 2016, the Court preliminarily approved the parties' Settlement and directed that class members be notified so that they could raise any objections they might have to the Settlement.  (8/10/16 Prelim. App. Order [DE 192].)  Since that time, Nissan has worked with the settlement administrator to obtain class member addresses and, as of October 7, has completed the dissemination of class notice.  (*See* 9/27/16 Notification re Class Notice [DE 193].)  Class members will now have until November 22, 2016, to object to the Settlement or opt-out of the Settlement Class.  (*See id.*; 8/10/16 Prelim. App. Order, ¶¶ 20, 23.)  After that deadline has passed, the parties will provide the Court with a full accounting of all class member feedback and will address the substance of any objections that class members might raise— including whether those objections should alter the analysis conducted by the Court and the parties at the preliminary approval stage.

At the present time, however, the parties continue to believe that the Settlement is in the best interests of the class and represents a fair, reasonable, and adequate compromise of the complex claims asserted on behalf of 2008-2009 Altima owners.  The hundreds of Florida Altima owners who have complained that their dashboards were melting, cracking, deforming, bloating, softening, or becoming sticky will now be able to obtain affordable dashboard replacements.  They will only need to pay $250 and Nissan will cover the remaining portion of the $1,500-$2,000 dashboard repair.  In addition, those consumers who previously paid for these high-cost dashboard repairs will be entitled to reimbursements of all but $250 of their out-of-pocket expenses.  In other words, Nissan is accepting financial responsibility for over 80% of the cost of all melting-dashboard repairs—a result that Class Counsel believes is more than fair, particularly given the statute-of-limitations defense and other potentially dispositive issues that Nissan had raised and remained pending as the case approached trial.  The parties accordingly move for final approval of the Settlement on the same grounds that they sought and obtained

1

preliminary approval—grounds that are reiterated below for the Court's and class members' convenience.

## II.   HISTORY OF THE LITIGATION

### A.   The Pleadings

This litigation began in November 2014 with the filing of Plaintiff Tracy Sanborn's Class Action Complaint.  (11/11/14 Compl. [DE 1].)  Louis Lucrezia joined the suit in January 2015 when Plaintiffs filed their Amended Class Action Complaint.  (1/26/15 Am. Compl. [DE 23].)  In the pleadings, Plaintiffs alleged that Nissan had violated the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) and unjustly enriched itself by selling Altimas with dashboards that Deteriorate and appear to melt and cast additional glare after several years in the Florida climate.  (*Id.*, ¶¶ 1-3, ¶¶ 23-30.)  Plaintiffs claimed that Nissan knew or should have known that the dashboards were not suitable for long-term use in a hot and humid environment, and asked that Nissan be directed to disclose the dashboard defect, repair the defective dashboards, and reimburse Altima owners their out-of-pocket repair expenses.  (*Id.*, ¶¶ 3, 57, 64.)

Nissan moved to dismiss the case on the pleadings, but in June 2015, the Court largely denied Nissan's motion and permitted both of Plaintiffs' claims to proceed.  (6/15/15 Order [DE 44].)  The Court did, however, limit the class of Florida consumers only to 2008 and 2009 Nissan Altima vehicles.  (*Id.* at 3-5.)

### B.   Discovery

During fact discovery, which closed in January 2016, Plaintiffs propounded 28 document requests to assess what Nissan knew about the Altima's dashboard material and when it knew it, and subpoenaed four of Nissan's suppliers.  After Plaintiffs and their expert consultants had evaluated the document productions, Plaintiffs then deposed Nissan's corporate representative and five other Nissan employees who were involved with the Altima's dashboards.  During this time, each plaintiff also responded to 11 interrogatories and 7 documents requests from Nissan, and each sat for deposition.  Plaintiffs' fact discovery did not turn up evidence that Nissan knew about the dashboard defect when it first distributed the 2008 and 2009 Nissan Altima.  But in Plaintiffs' view, the evidence could be interpreted to show Nissan should have known that the dashboard material was not properly formulated or tested, and that Nissan concealed the defect from the public when it did discover the defect.  (*See* Plfs. Opp. to MSJ [DE 153] at 2-7.)  Nissan vigorously contests Plaintiffs' view of the evidence.

Expert discovery proceeded until March 2016, and involved four experts retained by Plaintiffs and three by Nissan.  Plaintiffs retained an expert in automotive plastics, Dr. Anand Kasbekar, who opined that the Altima dashboard material was poorly formulated and that Nissan would have known about the defect if it had properly tested the material prior to release.  (*Id.* at 4-5.)  They retained an expert in the automotive industry, Richard Diklich, who inspected Deteriorated dashboards and testified that the resulting degradation was extraordinary and created glare that, under certain situations, could serve to obstruct a driver's vision.  (*See* 01/29/16 A. Zeman Decl. [DE 80], Ex. 22 at 4-5.)  Plaintiffs also retained a survey expert, Dr. Melissa Pittaoulis, who conducted a conjoint study to assess how consumers' willingness to pay for a Nissan Altima would have been affected if they had been told that the vehicles' dashboards were defective.  (*Id.*, Ex. 39.)  And they retained a damages expert, Frank Bernatowicz, who used the conjoint results and other methods to estimate the damages to class members and the amount of Nissan's unjust enrichment at over $1000 per class vehicle.  (*Id.*, Ex. 32 at 19-20.)

For their part, Nissan retained an expert in the automotive industry, Thomas Bryant, who opined that Nissan acted reasonably and could not have known that its dashboard material would Deteriorate in the way that it did under the conditions that it did—just as the other manufacturers who used the same dashboard material in their vehicles could not have known.  (02/26/16 D. Rao Decl. [DE 84], Ex. 14.)  Nissan also retained two economics professors, Dr. David W. Harless and Dr. George E. Hoffer, who opined that many class members could not have suffered any loss and found no evidence that 2008-2009 Altimas had suffered from a loss of resale value as a result of the alleged dashboard defect.  (*Id.*, Ex. 25.)

### C.     Motion Practice

At the time of settlement, calendar call for trial was only a week away and two critical motions in the case remained pending: Plaintiffs' motion for class certification [DE 77]; and Nissan's motion for summary judgment [DE 127].

Nissan had opposed certification of any class of 2008-2009 Altima consumers on the grounds that the majority of the proposed class's claims were time-barred, and those whose claims were not time-barred were used purchasers and had no claims against Nissan; that the proposed class included owners and lessees with vehicles whose dashboards had not manifested any defect; and that Plaintiffs' damage theory did not and could not account for differences between class members (such as whether they bought new, bought used, leased, or sold their

vehicle before any defect had manifested).  (2/26/15 Def. Opp. to Class Cert. [DE 85].)  For many of the same reasons, Nissan sought summary judgment against Plaintiffs and their proposed class, and sought to exclude Plaintiffs' damages experts from presenting their survey findings and damage calculations at trial.  (Def. MSJ [DE 127].)  Nissan argued that Florida's four-year statute of limitations could potentially prevent most of the class from recovering, and that because Florida does not have a discovery rule, it does not matter that it took more than four years for the melting-dashboard defect to become apparent to consumers.  Plaintiffs countered that, for reasons specific to this case, the statute of limitations should not be applied to bar Altima owners' claims.  *See* (3/9/16 Plfs. Mot. to Strike [DE 91].); (5/9/16 Plfs. Opp. to MSJ [DE 153] at 16-18.)  Also pending at the time of settlement were a number of other vigorously-contested motions that dealt with a variety of topics, including exclusion of expert testimony on both sides.  (*See* DE 135, 137, 140.)

### D.  Settlement Negotiations

The parties exchanged mediation statements and participated in a full day of mediation with Michael C. Siboni in April 2016, but were unable to reach an agreement.  (4/27/16 Mediator's Report [DE 145].)  Mediator Siboni continued his efforts to get the matter resolved, however, and in June—as the parties also exchanged witness and exhibit lists, prepared the pre-trial stipulation and proposed jury instructions, and otherwise prepared for trial in July—the discussions became more fruitful.  In the evening of June 30, 2016—only a week before calendar call—the parties reached agreement on the material terms of the settlement now before the Court.  (7/1/16 Mediator's Report [DE 186].)

## III.  OVERVIEW OF THE SETTLEMENT

### A.  The Settlement Class

The parties' proposed settlement, if approved by the Court, would be binding on the following Settlement Class:

> All consumers who are residents of, and purchased or leased a new or used 2008 or 2009 Nissan Altima in, the State of Florida on or before April 1, 2017.  The Settlement Class excludes any people or businesses that did not purchase or lease the Class Vehicles as consumers, thereby excluding any automobile dealers of any kind or others who did not lease or purchase the Class Vehicles for ordinary consumer use.

(Ex. A ("Settlement"), ¶ 2.21; *see also* Prelim. App. Order [DE 192], ¶ 1 (conditionally certifying the settlement class).)

### B.   Replacement of Deteriorating Dashboards

Under the Settlement, any Class Member whose dashboard has undergone "Deterioration"—defined to include cracking, deforming, melting, bloating, out-of-the-ordinary softening, and stickiness—may obtain a replacement dashboard from Nissan at a net cost of $250.  (*Id.*, ¶ 3.01.E.)  Replacement of a Deteriorated dashboard was previously a repair that could range from $1,500 to $2,000 depending upon certain factors, so Nissan will be paying more than 80% of the repair cost and Class Members with melted dashes will be saving over $1,250.  (*See* 7/29/16 Zeman Decl. [DE 191-1], ¶ 6.)  To obtain their replacement dashboards, Class Members will only need to present their vehicle at a Nissan dealership on or before April 29, 2017, and thereafter follow the Settlement's procedures.  (Settlement, ¶ 3.01.E.)  At that time, Class Members may either have their vehicle's dashboard replaced, or simply request that the dealership verify that their dashboard has Deterioration and then return at a later date— though no later than 120 days after the Court's final approval order becomes final.  (*Id.*, ¶¶ 2.11(b); 3.01.E.)

### C.   Reimbursement for Prior Expenses

Class Members who have already paid to repair their Deteriorated dashboards may also obtain relief.  Nissan will reimburse all but $250 of a class member's prior repair expenses.  (*Id.*, ¶ 3.01.D.)  For example, if a Class Member paid $1,500 for a dashboard replacement, Nissan would reimburse the class member $1,250.  (*Id.*)  Class Members will only need to complete, sign, and mail a simple claim form no later than 120 days after the Court's final approval order becomes final.  (*Id.*, ¶ 3.01. D & F.)  Nissan will make the initial determination of whether a claim for reimbursement is valid, but if Nissan denies a claim, Class Members will have the right to contest the decision through Class Counsel.  (*Id.*, ¶ 3.01.F.)  If after reviewing the Class Member's claim, Class Counsel believes the claim was improperly denied, they will first attempt to negotiate a resolution with Nissan's counsel; if the dispute remains unresolved, the parties will then seek the input of Mediator Siboni; and if the parties are still unable to agree, Mediator Siboni will have the power to make a final and binding determination.

### D.      Release of Class Claims

In exchange for the relief Nissan is providing, Plaintiffs and the Settlement Class agree to dismiss all claims in the Amended Class Action Complaint with prejudice.  (*Id.*, ¶ 5.01.)  They will also release and covenant not to bring any claims against Nissan or its affiliates related to the subject matter of this lawsuit, including any claims concerning any alleged dashboard defect, denial of warranty coverage for the dashboard (referred to in the Settlement interchangeably as the instrument panel or dashboard), or alleged misrepresentations or omissions concerning the dashboard.  (*Id.*)  The Settlement will not, however, release any claims for personal injury, wrongful death, or property damage (other than to the dashboard) that class members may have. (*Id.*)

### E.      Notice and Claims Administration

Nissan is paying all costs of administering the Settlement, including the cost of notifying Class Members about the Settlement.  (Settlement, ¶ 3.01.A-C; 8/10/16 Prelim. App. Order, ¶ 12.)  As of October 7, Nissan has mailed Class Members a formal notice, which describes the remedies available and affords Class Members an opportunity to object to the proposed Settlement or opt out of the Settlement Class.  (*See* 8/10/16 Prelim. App. Order, ¶¶ 10, 13.) Nissan has also made the class notice available on a settlement website that it has paid to establish and maintain.  (*Id.*, ¶ 13)

### F.      Attorney Fees, Costs, and Incentive Awards

After the parties reached agreement on a settlement of the class's claims, they proceeded to negotiate Class Counsel's claim for fees and expenses under the FDUTPA.  (7/29/16 Zeman Decl., ¶ 4.)  The FDUTPA authorizes the prevailing party to apply for and recover reasonable attorney fees and costs, and Class Counsel had incurred a lodestar in excess of $1,900,000.00, and over $350,000.00 in litigation costs.  Fla. Stat. § 501.2105; (Zeman Decl., ¶ 5).  With Mediator Siboni's assistance, the parties resolved that claim subject to Court approval.  They agreed that Class Counsel will petition the Court to award $1.3 million in attorney fees and up to $348,000 in costs so long as those costs are approved by Mediator Siboni after reviewing documentation submitted by Class Counsel.  (Settlement, ¶ 3.01.H.)  In exchange for Plaintiffs not seeking a higher amount, Nissan has agreed not to oppose Class Counsel's application and to pay the fee and cost award within 45 calendar days of Court approval becoming final.  (*Id.*, ¶¶ 3.01.H, 3.02.)  In addition, Class Counsel will petition the Court to award $5,000 incentive

payments to both Plaintiff Sanborn and Plaintiff Lucrezia in recognition of their services representing Altima owners over the past two years. Nissan has agreed to pay these amounts subject to Court approval. (*Id.*)

## IV.  ARGUMENT

As the Settlement will bind Class Members who do not choose to opt out, the Court must first ensure that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). To make this determination, courts in the Eleventh Circuit typically consider the following factors:

> (1) the likelihood of success at trial;
> (2) the range of possible recovery;
> (3) the range of possible recovery at which a settlement is fair, adequate, and reasonable;
> (4) the anticipated complexity, expense, and duration of litigation;
> (5) the opposition to the settlement; and
> (6) the stage of proceedings at which the settlement was achieved.

*Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2011). In addition, courts also consider whether the settlement appears to be a legitimate, arm's-length deal, or whether it is driven by fraud or collusion. *Wilson v. EverBank*, No. 14-CIV-22264, 2016 WL 457011, at \*6 (S.D. Fla. Feb. 3, 2016) (citing *Leverso v. SouthTrust Bank of Ala., N.A.,* 18 F.3d 1527, 1530 n.6 (11th Cir. 1994)).

The extent and substance of any opposition to the settlement cannot be fully evaluated until the objection and opt-out deadlines, but in Plaintiffs' view, the remaining factors confirm the Settlement to be advantageous to the class and worthy of judicial approval.

### 1.  Likelihood of Success

At the time of the Settlement, there was no order certifying the class and there was a pending motion for summary judgment by Nissan. If either of those decisions by this Court were wholly adverse to the Plaintiffs, the Class Members would have recovered nothing. Had Plaintiffs prevailed and the case proceeded to trial in July rather than settling, Plaintiffs were optimistic about their chances of establishing liability—though Nissan, of course, had a different view. Plaintiffs were prepared to present what they viewed as a strong factual case, having pieced together what they perceived as a compelling narrative that—while Nissan may not have possessed actual knowledge of the dashboard defect prior to selling Altima vehicles to consumers—it should have known that its dashboard material required stabilizers to prevent

hydrolysis; that Nissan's verification testing was inadequate and therefore failed to uncover the defect prior to release; and that when Nissan discovered the defect in other vehicle models, it failed to fix the problem in previously-sold Altimas and concealed the issue from Altima owners. Nissan would have argued that much of what Plaintiffs wanted to show the jury was legally irrelevant and never should have reached the jury.  Nissan also would have argued that it did nothing improper, that it reasonably relied upon sophisticated third-party suppliers, and that even other sophisticated automotive companies purchased dashboards that had the same chemical composition.  Finally, Nissan would have argued that it had no obligation to fix dashboards that melted outside of warranty.

There was, of course, a risk that the jury would side with Nissan and find nothing unfair or deceptive in its conduct, but the real risk to Plaintiffs and the class lay in Nissan's legal defenses.  Nissan's statute-of-limitations argument, in particular, threatened to leave nearly the entire class with no chance of a recovery.  Because it generally took 4-6 years before Altima dashboards began melting, it was not possible for most original purchasers and lessees of 2008-2009 Altima vehicles to file a class action before the 4-year statute of limitations had elapsed.  In similar situations, other states toll the statute of limitations under the delayed discovery doctrine, but Florida is an exception and rigorously applies its 4-year statute of limitations in situations like this one.  *See Matthews v. Am. Honda Motor Co.*, No. 12-60630-CIV, 2012 WL 2520675, at *3 (S.D. Fla. June 6, 2012); *Licul v. Volkswagen Grp. of Am., Inc.*, No. 13-61686-CIV, 2013 WL 6328734, at *6 (S.D. Fla. Dec. 5, 2013); *Speier-Roche v. Volkswagen Grp. of Am. Inc.*, No. 14-20107-CIV, 2014 WL 1745050, at *6-7 (S.D. Fla. Apr. 30, 2014).  Plaintiffs did have case-specific counter-arguments but historically, similar counter arguments have had little record of success in Florida courts.  *See id.*  And if Nissan won on its statute-of-limitations arguments, most of the class's claims would be time-barred.  Only those consumers who purchased used Altimas after November 2010 would have retained live claims, and once isolated, it would be difficult for those consumers to establish that Nissan owed a legal duty to used purchasers or to detect and quantify any damages to the secondary market.

Nissan also had asserted an array of other legal defenses that introduced additional risk for Plaintiffs and the Class Members.  Each of these issues had been fully briefed but not yet decided by the Court, and there was at least some chance that the Court would ultimately find one of the arguments persuasive.  For example, the Court could have held that Nissan could not

be held liable under the FDUTPA unless Plaintiffs demonstrated it had actual knowledge of the defective dashboards before selling Nissan Altimas to the class—something that Plaintiffs could not do.  (Nissan's MSJ [DE 127] at 5-8.)  Or the Court could have found that Plaintiffs should be precluded from presenting their damages model at trial because their experts' conjoint study did not adequately account for used purchasers, lessees, and consumers whose dashboards did not melt.  (Nissan's Daubert Motion [DE 137] at 11-16.)  Put simply, Nissan contended that Plaintiffs' models only proved hypothetical rather than actual damages and that they should therefore be barred.  It was far from certain that Plaintiffs would even be permitted to try their case on a class-wide basis, as Nissan had argued that its defenses and the difficulty of proving damages would override any efficiency gains to be had from trying liability on a class-wide basis.  (Nissan's Opp. to Class. Cert. [DE 85] at 7-17.)

All this is not to say that Plaintiffs could not have prevailed at trial.  They continue to believe that the facts are on their side, and that as an equitable matter, Altima owners should not be stuck with the choice between a melted dashboard and a $1,500 to $2,000 repair.  But from a legal perspective, it was a challenging case to even get to trial and many legal obstacles still remained in Class Members' way.

### 2.  The Range of Possible Recovery

As discussed above, Nissan's statute-of-limitations defense and other legal arguments made it quite possible that Plaintiffs and class members would recover nothing.  If they were to make it to the damages phase of trial, however, they would have asked the jury to award them damages of between $1,111 and $1,280 per class vehicle.  (01/29/16 A. Zeman Decl. [DE 80], Ex. 32 at 19-20.)  So the most that any given class member could reasonably have expected to receive (excluding any award of pre-judgment interest) if the case had continued through trial was $1,280.

### 3.  The Range of Recovery At Which Settlement Is Fair, Adequate, and Reasonable.

Under the proposed settlement, Nissan will pay all but $250 of the cost of replacement dashboards for class vehicles with melted dashes.  Because a dashboard replacement typically costs $1,500 to $2,000, that means Nissan is paying around $1,250 to $1,750 for each repair. This compares favorably to the $1,111 to $1,280 that Plaintiffs were seeking.  For Class

Members who have already paid for dashboard replacements, the Settlement therefore provides relief close to the maximum they could have recovered through a successful verdict.

The primary difference between the Settlement and the relief Plaintiffs were seeking is how Class Members who have not paid for a dashboard replacement are handled. Without a Settlement, there was not a feasible way to separate (i) those Altima owners who suffered from melting dashboards but did not pay for a replacement due to the high cost from (ii) those Altima owners whose dashboards never melted. Individual inspections would have been required, which typically results in denial of class certification and leaves consumers to fend for themselves. *See Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1141 (Fla. Dist. Ct. App. 2008). Plaintiffs therefore proposed that the jury award the same amount for each class vehicle, regardless of whether its dashboard ultimately melted. As Nissan argued repeatedly, this Court has previously found that it is inappropriate to seek relief for consumers with manifested defects as well as for consumers whose product has performed satisfactorily. *Breakstone v. Caterpillar, Inc.*, No. 09-23324-CIV, 2010 WL 2164440, at *6 (S.D. Fla. May 26, 2010) (Moore, C.J.). Plaintiffs believe that there is support for the countervailing view, based on Florida law that allows damages to be measured at the point of sale. *See Collins v. DaimlerChrysler Corp.,* 894 So. 2d 988, 990 (Fla. Dist. Ct. App. 2004). Under that case law, damages could be awarded based on the difference between the market value of a Nissan Altima with dashboard material that might melt in Florida conditions and the market value of a Nissan Altima with dashboard material that is not susceptible to melting in Florida conditions. That measure of damages does not depend on whether a defect has actually manifested itself, but it requires that Plaintiffs be able to reliably estimate how the possibility of a dashboard melting in 4-6 years would affect the market value of a vehicle at the time of sale. Plaintiffs attempted to measure this through a conjoint study, which uses survey data to gauge how consumers' willingness to pay is affected by certain variables. It is necessarily an inexact science that relies on averages and other statistical methods, and while the method has been accepted for *Daubert* purposes in other cases, Nissan vigorously opposed its use and, if that evidence did reach the jury, the jury would still need to accept both that Altima owners whose dashboards never melted suffered damages and that Plaintiffs' experts had accurately estimated the extent of those damages.

The Settlement resolves the difficulties of measuring market-value effects and avoids the somewhat counter-intuitive result of providing the same relief regardless of whether a given

dashboard has melted or functioned properly.  By agreeing to a process for vehicles with Deterioration to be identified and replaced—with Nissan bearing more than 80% of the cost—Plaintiffs were able to overcome the limitations inherent in a class-wide damages model.  While Nissan will pay less than if it was ordered to compensate every Altima owner (regardless of whether they actually suffered from a melting dashboard), the Settlement ensures that those class members who most need a remedy receive one.  Based on the difficulties the class would face proving liability as well as proving damages on a class-wide basis, Plaintiffs believe this to be a fair compromise that accomplishes the primary purpose of the lawsuit.  (*See* 1/26/15 Am. Compl. [DE 23], ¶ 3 (requesting that Nissan be directed to disclose the dashboard defect, repair the defective dashboards, and reimburse Altima owners their out-of-pocket repair expenses).  That is particularly so given that Nissan's various defenses could well leave Class Members with nothing.  *See Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005) (even a settlement that offers only 0.01% or 0.001% of the potential recovery can be fair when strong defenses are present).  In light of the significant risk that continued litigation poses to Class Members, and the fact that the Settlement offers $1,250 to $1,750 in reimbursements and repairs to Class Members who experienced Deterioration, Plaintiffs believe the Settlement should be approved as fair, reasonable, and adequate.

### 4.    The Anticipated Complexity, Expense, and Duration of Litigation

As discussed in the preceding sections, this litigation involves a number of thorny legal issues, many of which have yet to be resolved.  The case's complexity means that there are many ways for class members to lose, and is one of the primary reasons that Plaintiffs are in favor of a negotiated resolution rather than continued litigation.  In addition, even if Plaintiffs were to prevail on each of the legal issues currently before the Court and then prevail before the jury, Nissan would be certain to file an appeal that would be equally complex and could take years to resolve.  The melting dashboard issue came to prominence in 2014, and many consumers have been waiting years for assistance.  Continued litigation would mean that these Altima owners would have to wait even longer, and by the time that the case proceeded through trial and the ensuing appeals, any relief that Plaintiffs ended up obtaining would be that much less useful. This is a case where the timeliness of relief is as important, if not more important, than the amount of that relief.  One of the greatest virtues of the Settlement, therefore, is not just that it

offers class members who experienced Deterioration considerable relief—but that it does so sooner rather than later.

### 5.    The Substance and Amount of Opposition to the Settlement

The Class Members have only recently received notice of the Settlement and will now be given until November 15 to object or opt out, so this factor cannot be fully evaluated at this time (8/10/16 Prelim. App. Order, ¶¶ 20, 23.)  But it is worth mentioning that Class Counsel were contacted by hundreds of Class Members throughout this case, and so were able to consult with at least some of them before negotiating and agreeing to the Settlement.  As a result of their conversations with various class members, Class Counsel had a good sense of the amounts that Altima owners would be able and willing to pay to repair their dashboards with Deterioration. (7/29/16 Zeman Decl., ¶ 7.)  Those conversations also underscored how important it was for class members to obtain relief sooner rather than later.  (*Id.*)  So while a thorough assessment of the class's reaction to the Settlement will need to wait until Class Members have been given a full and fair opportunity to make their views known, the initial class reaction was positive and helped to confirm for Class Counsel that the Settlement was a deal worth making.

### 6.    The Stage of Proceedings At Which Settlement Was Achieved

"The stage of the proceedings at which a settlement is achieved is evaluated to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Lipuma*, 406 F. Supp. 2d at 1324. Here, there can be little doubt that both sides were well aware of the relevant facts, the strengths and weaknesses of their respective legal positions, and the risks and advantages of continued litigation.  Discovery closed earlier this year, the parties had briefed every major issue in the case—through class certification, summary judgment, *Daubert*, and in limine motions, among others—and each side was in the midst of their final trial preparations when the case settled. (*See* Sections II.A-C, *infra*.)

### 7.    Absence of Fraud or Collusion

In addition to considering whether the Settlement is substantively fair to the Class Members, the Court should also ensure that it was negotiated at arm's length rather than collusively.  *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014). Here, the case was hotly contested for nearly two years, the parties were unable to reach

agreement at an April 2016 mediation, and ultimately resolved the case only after several weeks of negotiations conducted through Mediator Michael C. Siboni.  (7/29/16 Zeman Decl., ¶ 3.) The Settlement they reached provides substantial relief to Class Members and there is nothing within its terms to suggest that Plaintiffs or their counsel compromised class interests to benefit themselves.  Attorney fees were negotiated only after the terms of class relief were reached, and the ultimate agreement between the Parties calls for Class Counsel to receive materially less than their lodestar in attorney fees.  (*Id.*, ¶ 5, Settlement, ¶ 3.01.H); *See Rogers v. Nacchio*, No. 05-60667-CIV, 2007 WL 1064314, at *4 (S.D. Fla. Apr. 6, 2007) (FDUTPA attorney fees are calculated using the lodestar method); *Barnhill v. Florida Microsoft Anti-Trust Litig.*, 905 So. 2d 195, 200 (Fla. Dist. Ct. App. 2005) (approving 1.77 lodestar multiplier under the FDUTPA). Similarly, the $5,000 incentive awards that Nissan agreed to pay the named plaintiffs are not excessive and fall within the range typically approved by courts.  *See, e.g.*, *Fresco v. Automotive Directions, Inc., et al.*, No. 03-CIV-61063, 2009 WL 9054828, at *6 (S.D. Fla. Jan. 20, 2009) (approving $15,000 service/incentive awards for each plaintiff); *Curry v. AvMed, Inc.*, No. 10-CV-24513-JLK, 2014 WL 7801286, at *3 (S.D. Fla. Feb. 28, 2014) (approving $5,000 incentive awards for each plaintiff).

## V.     CONCLUSION

For the foregoing reasons, the parties believe there is no reason for the Court to depart from the findings that led it to preliminarily approve the parties' Settlement, and respectfully request that the Court now finally approve the Settlement and enter judgment consistent with its terms.

Dated: October 14, 2016                             Respectfully Submitted,

**GIBBS LAW GROUP LLP**

By: ____ /s/ Amy M. Zeman _____

Amy Zeman (FL Bar No. 110653)
3711 Sheridan Ave
Miami Beach, FL 33140
T:  (510) 350-9721 F:  (510) 350-9701
Email:  amz@classlawgroup.com

Eric H. Gibbs (admitted pro hac vice)
505 14th Street, Suite 1110
Oakland, CA  94612
T: (510) 350-9700  F: (510) 350-9701
Email:  ehg@classlawgroup.com

Gregory F Coleman (admitted pro hac vice)
Adam Edwards (admitted pro hac vice)
**GREG COLEMAN LAW PC**
800 South Gay Street, Suite 1100
Knoxville Tennessee 37929
T:  (865) 247-0080  F: (510) 350-9701
Email:  greg@gregcolemanlaw.com
          adam@gregcolemanlaw.com

John A. Yanchunis (FL Bar No. 324681)
James D. Young (FL Bar No. 567507)
**MORGAN & MORGAN**
201 N. Franklin St. 7th Floor
Tampa, FL  33602-5157
Phone:  (813) 275-5272
Fax:  (813) 275-9295
Email:  jyanchunis@forthepeople.com
          jyoung@forthepeople.com

*Attorneys for Plaintiffs*


JENNER & BLOCK LLP

By:    /s/ Peter J. Brennan_____
Peter J. Brennan (*pro hac vice*)
pbrennan@jenner.com
353 N. Clark Street
Chicago, IL 60654-3456
Phone: 312-222-9350; Fax: 312-527-0484

Devi M. Rao (*pro hac vice*)
drao@jenner.com
1099 New York Avenue NW, Suite 900
Washington, DC 20001-4412
Phone: 202-637-6390; Fax: 202-639-6066

BOWMAN AND BROOKE, LLP

John C. Seipp, Jr. (Fl. Bar No. 0289264)
Donald A. Blackwell (Fl. Bar No. 370967)
Two Alhambra Plaza, Suite 800
Coral Gables, Florida 33134
Phone: 305-995-5600; Fax: 305-995-6090

*Counsel for Nissan North America, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2016, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States District Court, Southern District of Florida, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: October 14, 2016

**GIBBS LAW GROUP LLP**

By:_____/s/ Amy M. Zeman_____

Amy Zeman (FL Bar No. 110653)
3711 Sheridan Ave
Miami Beach, FL 33140
T:  (510) 350-9721 F:  (510) 350-9701
Email:  amz@classlawgroup.com